**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GIANT EAGLE, INC. and HBC SERVICE COMPANY, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY | ) ) ) |
| and | ) ) |
| XL SPECIALTY INSURANCE COMPANY, | ) ) |
| Defendants. | ) ) ) |

**CASE NO.**   2:19-cv-904

**COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES**

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Giant Eagle, Inc. and HBC Service Company, (collectively, "Giant Eagle") by and through their undersigned counsel, for this Complaint and Demand for Jury Trial against American Guarantee and Liability Insurance Company ("Zurich") and XL Specialty Insurance Company ("XL Specialty"), allege as follows:

## NATURE OF THE ACTION

1.      In this lawsuit, Giant Eagle seeks to enforce its rights to a defense and the costs of defending multiple lawsuits under a series of general liability insurance contracts.

2.      Along with other members of the pharmaceutical industry, Giant Eagle has been sued in multiple lawsuits filed in Ohio and New York by plaintiffs seeking to recover billions of dollars for alleged harm from the manufacture, marketing, sales and distribution of prescription opioids, including response costs, treatment costs and other damages allegedly resulting from

bodily injury to citizens in the underlying plaintiffs' communities.  Many of these lawsuits are part of the largest multidistrict litigation in United States history.  With trial in two cases only months away, defendant Zurich has denied coverage and refused outright to defend Giant Eagle against these baseless claims.  Defendant XL Specialty, after simply ignoring Giant Eagle's multiple requests for a defense for six months, has issued a reservation of rights without assuming a defense.

3.     There is no basis for the failure of Giant Eagle's insurers to honor their contractual obligations to provide Giant Eagle with a defense.  Numerous courts interpreting nearly identical policy language in coverage actions have ruled that general liability insurers must defend opioids litigation.

4.     Against this background, Giant Eagle urgently seeks a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), of the rights and obligations of itself and two insurers who sold it policies of general liability insurance that include a duty to defend claims alleging covered or arguably covered "occurrences" during the nine-year period from April 1, 2009 to April 1, 2018.  Specifically, Giant Eagle seeks a declaration that XL Specialty and Zurich have a duty to defend Giant Eagle against lawsuits brought against Giant Eagle in Ohio and New York as part of ongoing nationwide litigation against manufacturers, distributors, and pharmacies that distribute and dispense opioid medicine, as well as any future lawsuits filed against Giant Eagle in any jurisdiction asserting the same claims.

5.     Giant Eagle also seeks damages against defendants XL Specialty and Zurich for breach of contract, breach of the duty of good faith and fair dealing and bad faith, including consequential damages, punitive damages and attorneys' fees.

6.      Plaintiff Giant Eagle is a privately-owned supermarket retailer and distributor. Incorporated in 1931, Giant Eagle now operates approximately 212 grocery stores with pharmacies throughout western Pennsylvania, north central Ohio, northern West Virginia, Maryland and Indiana.

7.      The claimants in the underlying opioid lawsuits in Ohio assert claims against Giant Eagle arising out of Giant Eagle's distribution of certain prescription medicine to its own grocery store pharmacies in Ohio, beginning in or about November 2009.  (Giant Eagle does not operate in New York.)

8.      In each of the nine years of insurance coverage at issue, Giant Eagle retained the first $2 million of risk per occurrence for covered claims, including defense costs, and purchased millions of dollars of insurance coverage above the retained risk, including $25 million per occurrence per year from Zurich (for seven years) and then from XL Specialty (for two years).

9.      Prior to being named in the opioid lawsuits at issue, Giant Eagle had never tendered a claim under any of these nine years of coverage that reached or exceeded the retention.

10.     Giant Eagle's monthly defense costs for the opioid lawsuits have risen to hundreds of thousands of dollars and these costs are expected to increase significantly as trial approaches.  Months ago, Giant Eagle's payments for defense costs quickly reached and then exceeded $2 million for the opioid lawsuits, two of which are scheduled for trial in October 2019 as bellwether cases in the massive federal multidistrict litigation.  Giant Eagle, a regional supermarket retailer, is named as a defendant alongside the largest pharmaceutical manufacturers and distributors in the world.  The costs of defending these cases are exorbitant and mounting.

As but one example, the parties in the first two cases have designated a total of over 100 testifying experts.

11.     Now, after collecting nine years of premiums, Defendants have abandoned Giant Eagle in its hour of greatest need and repudiated or refused to acknowledge their duty to defend Giant Eagle under their general liability policies.

12.     Each of the general liability policies issued by Zurich and XL Specialty imposes, by its express terms, a duty to defend potentially or arguably covered claims.  Liability insurance is, in effect, litigation insurance procured by an insured to manage the risk associated with, among other things, the costs of defending claims brought against it.  Giant Eagle reasonably expected that Defendants, as its general liability insurers, would defend it against claims that are potentially or arguably covered by the policies.  Defendants' denial or withholding of a defense against the opioid lawsuits has violated these reasonable expectations.

13.     As a foreseeable result of this abandonment, Giant Eagle has been forced to commence this lawsuit to enforce its rights.  Among other relief, Giant Eagle seeks a declaratory judgment on the duty to defend.  Speedy relief is necessary to preserve Giant Eagle's rights that may otherwise be impaired as these underlying cases approach trial.

## PARTIES

14.     Plaintiff Giant Eagle, Inc. is incorporated under the laws of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania.

15.     Plaintiff HBC Service Company ("HBC") is, and at all times material to this Complaint was, an unincorporated operating division of Giant Eagle, Inc.

4

16.     Upon information and belief, defendant American Guarantee and Liability Insurance Company is incorporated under the laws of New York with its principal place of business in Illinois.

17.     Upon information and belief, defendant XL Specialty is incorporated under the laws of Delaware with its principal place of business in Connecticut.

## JURISDICTION AND VENUE

18.     This Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332.  This action is between citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.     This Court has personal jurisdiction over Defendants by virtue of their business activity within the Commonwealth of Pennsylvania.

20.     Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this Complaint and Demand for Jury Trial occurred in this district.

## FACTS

A.      **THE OPIOID LAWSUITS**

21.     Scores of governmental entities and one provider of mental health and addiction services have sued HBC, among other defendants, in seven lawsuits in federal court in Ohio. These seven lawsuits are:

    a.  *City of Cleveland, Ohio v. Purdue Pharma, L.P.,* Case No. 18-OP-45132 (N.D. Ohio) (the "Cleveland Action");

    b.  *Cty. of Cuyahoga, Ohio v. Purdue Pharma, L.P.,* Case No. 17-OP-45004 (N.D. Ohio) (the "Cuyahoga Action");

    c.   *Cty. of Summit and City of Akron, Ohio v. Purdue Pharma, L.P.,* Case No. 18-OP-45090 (N.D. Ohio) (the "Summit Action");

    d.   *City of Barberton, Ohio v. Purdue Pharma, L.P.,* Case No. 18-OP-45767 (N.D. Ohio) (the "Barberton Action");

    e.   *Columbiana Cty. Bd. of Comm'rs v. AmerisourceBergen Drug Corp.,* Case No. 1:18-op-45289-DAP (N.D. Ohio) (the "Columbiana Action");

    f.   *Geauga Cty. Bd. of Comm'rs v. AmerisourceBergen Drug Corp.*, Case No. 1:18-op-45256 (N.D. Ohio) (the "Geauga Action"); and

    g.   *Mental Health & Recovery Servs. Bd. of Allen v. Purdue Pharma, L.P.*, Case No. 18-OP-46344 (N.D. Ohio) (the "Mental Health Services" Action).[1]

22.    Additionally, five cities in New York State have sued HBC in lawsuits that have been removed to federal courts in New York.  These five lawsuits are:

    a.   *City of Saratoga Springs v. Purdue Pharma L.P.*, Index No. 20191805 (Supreme Court of the State of New York, County of Saratoga) removed to U.S. District Court, Northern District of New York, Albany Division, Civil Action No. 1:19-cv-00789 (the "Saratoga Springs Action");

    b.   *City of Rochester v Purdue Pharma L.P.*, Index No. E20191005178 (Supreme Court of the State of New York, County of Monroe); removed to U.S. District Court, Western District of New York, Rochester Division, Civil Action No. 6:19-cv-06490 (the "Rochester Action");

    c.   *City of Auburn v. Purdue Pharma L.P.*, Index No. E20190669 (Supreme Court of the State of New York, County of Cayuga); removed to U.S. District Court,

[1] The operative complaints, which are public records, are voluminous and are not attached.  Giant Eagle incorporates the allegations set forth in the Opioid Lawsuits herein by reference.

Eastern District of New York, Central Islip Division, Civil Action No. 2:19-cv-
03800 (the "Auburn Action");

d.  *City of Poughkeepsie v. Purdue Pharma, et. al.,* Index No. 2019-51786 (Supreme
Court of the State of New York, County of Dutchess; removed to U.S. District
Court, Southern District of New York, Civil Action No. 9:19-cv-06800-KMK (the
"Poughkeepsie Action"); and

e.  *City of Ogdensburg v. Purdue Pharma L.P.*, Index No. EFCV-19-155727
(Supreme Court of the State of New York, County of St. Lawrence) removed to
U.S. District Court, Northern District of New York, Utica Division, Civil Action
No. 8:19-cv-00782 (the "Ogdensburg Action").

23.    These twelve lawsuits are collectively referred to herein as the "Opioid Lawsuits."

24.    The seven Opioid Lawsuits pending in Ohio have been transferred to the
consolidated multidistrict litigation captioned *In re National Prescription Opiate Litigation*,
MDL No. 2804 (N. D. Ohio.) pending before United States District Court Judge Polster (the
"MDL").

25.    Judge Polster has designated the Cleveland, Cuyahoga and Summit Actions as
Track One cases, and has set the Cuyahoga and Summit Actions for trial in October 2019.

26.    The MDL Track One Opioid Lawsuits allege substantively identical facts and
assert substantively identical causes of action against HBC.  The Opioid Lawsuits allege that
HBC is an operating division of Giant Eagle, Inc. and name HBC as a "Distributor Defendant."
*See, e.g.,* Cleveland Action ¶¶ 91 and 95-96; Cuyahoga Action ¶¶ 89 and 95; Summit Action ¶¶
113 and 127-28.

27.     The MDL Track One Opioid Lawsuits assert that HBC distributed prescription opioids in the underlying plaintiffs' respective communities in Ohio, and, along with other defendants, breached certain duties by failing to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified.  *See, e.g.,* Cleveland Action ¶¶ 9, 81, 91, 488, and 574; Cuyahoga Action ¶¶ 9, 81, 89, 488, and 573; Summit Action ¶¶ 9, 107, 113, 518.

28.     The Complaints in the MDL Track One cases allege that these failures resulted in the oversupply of opioids in the underlying plaintiffs' respective communities, causing bodily injury.  *See, e.g.,* Cleveland Action ¶¶ 9, 81, 466, and 689-93; Cuyahoga Action ¶¶ 9, 81, 466, and 682-689; Summit Action ¶¶ 9, 107, 498, 714, 721-745.

29.     The plaintiffs in the underlying MDL Track One cases allege that an oversupply of opioids has resulted in a "public health epidemic" in the underlying plaintiffs' respective communities with increased addiction, overdose and death.  *See, e.g.*, Cleveland Action ¶¶ 17 and 689-710; Cuyahoga Action ¶¶ 17 and 688-695; Summit Action ¶¶ 18 and 721-745.

30.     The plaintiffs in the underlying MDL Track One cases allege that this oversupply of opioids, and resulting bodily injury to citizens in the underlying plaintiffs' respective communities, has "saddled" those plaintiffs with "an enormous economic burden," causing them to suffer certain damages, including, having to fund medication-assisted treatment, residential treatment, recovery housing, detoxification programs and prevention efforts along with additional resources necessary for public safety and other services.  *See, e.g.,* Cleveland Action ¶¶ 686-87, 695, and 701; Cuyahoga Action ¶¶ 693 and 695-96; Summit Action ¶¶ 721-745.

31.     The plaintiffs in the underlying MDL Track One cases allege that HBC's breach of these certain duties exposed those plaintiffs to an unreasonable risk of harm, and created an

ongoing, significant and unreasonable interference with the public health, welfare, safety, peace, comfort, and convenience of the underlying plaintiffs and their respective communities.

32.     The plaintiffs in the underlying MDL Track One cases assert causes of action against HBC for statutory and common law public nuisance, negligence, and deceptive trade practices, among other claims.  *See, e.g.,* Cleveland Action ¶¶ 934-1033; Cuyahoga Action ¶¶ 1003-1101; Summit Action ¶¶ 974-1071.

33.     The plaintiffs' allegations in the underlying Barberton, Columbiana and Geauga Actions are like those asserted in the MDL Track One cases.  For instance, the Barberton complaint alleges that HBC had a legal duty to exercise reasonable care in the distribution of prescription opioids, including a duty to design and operate a system that identified suspicious orders of prescription opioids, maintain effective controls against diversion of opioids, and halt suspicious orders.  *See, e.g.*, Barberton Action ¶¶ 9, 1038.  The Barberton Action alleges that HBC breached this duty by, among other things, distributing opioids in a manner that facilitated their flow into secondary markets and failed to effectively monitor, investigate and report suspicious orders.  *Id.* at ¶ 1042.  The Barberton Action asserts claims against HBC for, among other things, statutory and common law nuisance and negligence.  *Id*. at ¶¶ 974-1068.

34.     HBC is sued as a "Distributor Defendant" in both the Geauga Action and the Columbiana Action.  Both lawsuits allege, among other things, that HBC owed plaintiffs a duty to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids, and that HBC breached each of these duties. *See* Geauga Action, ¶¶ 152, 177-80, 187-90; Columbiana Action, ¶¶ 159, 184-87. 194-97.  The causes of action asserted against HBC by plaintiffs in the Geauga Action and the Columbiana Action include public nuisance, negligence

and negligent misrepresentation, and negligence *per se*.  Geauga Action, ¶¶ 264-305, 473-504; Columbiana Action, ¶¶ 271-312, 480-511.

35.     The plaintiffs in the underlying Saratoga Springs, Rochester, Auburn, Poughkeepsie and Ogdensburg Actions each allege that HBC had a duty to use reasonable care in the distribution of opioids, and that HBC breached its duty or was otherwise negligent by, among other things, failing to take action to prevent or reduce the distribution of opioids, to monitor and guard against third-party misconduct, or to disclose suspicious orders to the plaintiffs. *See, e.g.,* Rochester Action, ¶¶ 1193-97; Auburn Action, ¶¶ 1190-95; Ogdensburg Action, ¶¶ 1192-96; Saratoga Springs Action, ¶¶ 1193-97; Poughkeepsie Action, ¶¶ 1128-1132. Each of the complaints avers, among other counts, causes of action for public nuisance and negligence, and seeks compensatory damages and other relief.  *See* Rochester Action, ¶¶ 1161-69, 1192-1207; Auburn Action, ¶¶ 1159-1167, 1190-1205; Ogdensburg Action, ¶¶ 1160-68, 1191-1206; Saratoga Springs Action, ¶¶ 1161-69, 1192-1207; Poughkeepsie Action, ¶¶ 1097-1104, 1127-1142.

36.     The plaintiff in the underlying Mental Health Services Action alleges that it is statutorily empowered to plan, develop, fund, manage, and evaluate community-based mental health and addiction services.  Mental Health Services Action ¶ 27.  This plaintiff alleges that it provides a variety of programs for certain Ohio residents, including programs for opiate addiction, alcohol and drug counseling, and mental health services.  *Id*.  The Mental Health Services Action asserts causes of action against HBC for public nuisance, negligence and civil conspiracy, among others.  *Id*. at ¶¶ 886-964; 1016-1031.  This underlying plaintiff seeks to recover compensatory and other damages.  *Id*. at ¶ 1032.

37. Discovery in the MDL has shown that HBC first distributed hydrocodone, a Schedule III controlled substance (which later was classified as a Schedule II controlled substance in 2014), in Ohio beginning in or about November 2009.

38. The underlying plaintiffs in the Opioid Lawsuits claim continuing harms, allegedly caused by HBC's actions or inactions, in each year through and including 2018.

## B.   THE INSURANCE POLICIES

39. During the time period relevant to this dispute, Giant Eagle purchased a series of excess/umbrella policies from Zurich and XL Specialty.   Each of these policies provide insurance coverage excess of underlying policies issued by Old Republic Insurance Company ("Old Republic") as well as umbrella coverage, subject to aggregate limits of $25 million.

### i.   *The Zurich Policies (April 2009 to April 2016)*

40. Zurich sold Giant Eagle a series of Commercial Umbrella Liability Policies, which each provide, among other things, $25 million in excess insurance coverage applicable after the exhaustion of the underlying coverage (the "Zurich Excess Policies").  These policies are not attached to this Complaint because they are voluminous and, on information and belief, are in Zurich's possession.  Specifically, Zurich sold Giant Eagle the following policies, the terms and conditions of which are incorporated by reference herein:

| POLICY NUMBER | POLICY PERIOD |
|---|---|
| AUC 2856587-11 | April 1, 2009 to April 1, 2010 |
| AUC 2856587-12 | April 1, 2010 to April 1, 2011 |
| AUC 2856587-13 | April 1, 2011 to April 1, 2012 |
| AUC 2856587-14 | April 1, 2012 to April 1, 2013 |
| AUC 2856587-15 | April 1, 2013 to April 1, 2014 |

| AUC 2856587-16 | April 1, 2014 to April 1, 2015 |
| AUC 2856587-17 | April 1, 2015 to April 1, 2016 |

41.     Each of the Zurich Excess Policies provide both excess coverage above the limits of liability of the underlying Old Republic Policies as well as umbrella coverage for the corresponding policy periods.  Coverage under each of the Zurich Policies is provided pursuant to the same terms and conditions.

42.     Coverage A – Excess Follow Form Liability Insurance, provides that Zurich "will pay on behalf of the **insured** those damages covered by this insurance in excess of the total applicable limits of **underlying insurance**.  With respect to **Coverage A**" the Zurich Excess Policies incorporate "the terms and conditions of **underlying insurance** to the extent such terms and conditions are not inconsistent or do not conflict with the terms and conditions" of the Zurich Excess Policies.

43.     The Zurich Excess Policies define **underlying insurance** to mean "the policy or policies of insurance listed in the Schedule of Underlying Insurance forming a part of this policy."

44.     The Schedule of Underlying Insurance in the Zurich Excess policies list as underlying insurance the following insurance policies issued to Giant Eagle by Old Republic during the corresponding policy period between April 1, 2009 through April 1, 2016 (the "Old Republic Policies").  These Old Republic Policies are not attached to this Complaint because they are voluminous and, on information and belief, are in the Defendants' possession.  Each of these policies is identified in the chart below, and the terms and conditions of each policy are incorporated herein by reference:

| POLICY NUMBER | POLICY PERIOD |
|---|---|
| MWZX 26658 | April 1, 2009 to April 1, 2010 |
| MWZX 26669 | April 1, 2010 to April 1, 2011 |
| MWZX 26706 | April 1, 2011 to April 1, 2014 |
| MWZY 301188 | April 1, 2014 to April 1, 2015 |
| MWZY 304638 | April 1, 2015 to April 1, 2016 |

45. Each Old Republic Policy provides Giant Eagle with a $1,000,000 "Each Occurrence Limit," subject to a $3,000,000 Products-Completed Operations Aggregate Limit and a $15,000,000 General Aggregate Limit.

46. Coverage under the Old Republic Policies is subject to a $1,000,000 self-insured retention that applies for each occurrence. The self-insured retention does not reduce the applicable limits of the Old Republic Policies.

47. The Old Republic policies are also subject to a $1,000,000 deductible per policy period, the satisfaction of which exhausts the policy's applicable limits.

48. Each of the Zurich Excess policies provide that Zurich "has the right and duty to assume . . . defense of any **suit** against [Giant Eagle] for damages covered by [the] policy." With respect to Coverage A, Zurich's right and duty to defend applies "when the applicable limit of **underlying insurance** and **other insurance** has been "exhausted by payment of **loss** for which coverage is afforded under this policy."

49. The Zurich Policy defines **Loss** as follows:

those sums actually paid that the **insured** is legally obligated to pay as damages for the settlement or satisfaction of claim because of injury or offense, after making proper deductions for all recoveries and salvage. However:

13

    **a.** Under **Coverage A**:

    **(1) Loss** also includes defense expenses and supplementary payments if **underlying insurance** includes defense expenses and supplementary payments in the Limits of Insurance; and

    **(2) Loss** does not include defense expenses and supplementary payments if **underlying insurance** does not include defense expenses and supplementary payment in the Limits of Insurance.

50.    The **underlying insurance** does include defense expenses and supplementary payments in the Limits of Insurance.

51.    Specifically, each of the Old Republic policies identified in the Schedules of Underlying Insurance of the Zurich Excess Policies contains a "SELF INSURED RETENTION ENDORSEMENT (SUPPLEMENTARY PAYMENTS/ALAE PRO RATA)" (the "Defense Costs Pro Rata Endorsements"). These Defense Costs Pro Rata endorsements each provide that: "In addition to the Scheduled 'self-insured retention' you [Giant Eagle] are responsible for payment of a proportion of Supplementary Payments and/or allocated loss adjustment expenses. Your proportion is equal to the ratio that the 'self-insured retention' amount bears to the damages and medical expenses paid. If there is no loss payment, your proportion of Supplementary Payments and/or allocated loss adjustment expenses is 100%." These Defense Costs Pro Rata Endorsements further provide that Old Republic has a duty to defend "any claim or 'suit' that exceeds the 'self-insured retention.'"

52.    Giant Eagle and Old Republic separately entered into a Program Agreement that superseded, as between Giant Eagle and Old Republic, but did not modify, the Defense Costs Pro Rata Endorsements. The Program Agreement is not listed in the Schedules of Underlying Insurance of, and does not form a part of, the Zurich Excess policies.

53.     Giant Eagle has paid more than $2 million defending against the Opioid Lawsuits. These amounts constitute payment of **loss** under the Zurich Excess Policies because each of the Old Republic policies identified in the Schedules of Underlying Insurance of the Zurich Excess Policies contains a defense obligation.  Therefore, Zurich's duty to defend has been triggered by Giant Eagle's payment of $2 million in defense costs.

**ii. _The XL Specialty Policies (April 2016 to April 2018)_**

54.     XL Specialty sold Giant Eagle the following Commercial Excess Follow Form and Umbrella Liability Policies (the "XL Specialty Excess Policies"), the terms and conditions of which are incorporated by reference herein:

| POLICY NUMBER | POLICY PERIOD |
|---|---|
| US00074903LI16A | April 1, 2016 to April 1, 2017 |
| US00074903LI17A | April 1, 2017 to April 1, 2018 |

The XL Specialty Policies are not attached to this Complaint because they are voluminous and, on information and belief, are in the XL Specialty's possession.

55.     The XL Specialty Excess Policies both contain the same policy forms and provide coverage pursuant to the same terms and conditions.

56.     The XL Specialty Excess Policies provide $25 million in insurance coverage, including "follow form" excess coverage that applies after exhaustion of the limits of the underlying Old Republic Policies in place for the period from April 1, 2016 to April 1, 2018, as well as umbrella coverage.

57.     Specifically, Insuring Agreement A – Excess Follow Form Liability, provides:

We will pay on behalf of the **insured** . . . those amounts the **insured** becomes legally obligated to pay as damages in excess of the **scheduled underlying insurance** as a result of a **claim** covered by the **scheduled underlying insurance**

15

and this policy, but only if the actual payment of **loss** to which this policy applies, by you or insurers providing **scheduled underlying insurance** exceeds the limits of the **scheduled underlying insurance** . . .

("Insuring Agreement A").   The XL Specialty Excess Policies identify the Old Republic Policies as the "scheduled underlying insurance," as well as the Old Republic Policies' $1,000,000 each occurrence limit of liability.

58.     Coverage under Insuring Agreement A of the XL Specialty Excess Policies "shall follow the terms, definitions, conditions and limitations of" the Old Republic Policies subject to "any contrary provisions contained in [the XL Excess Policies]."

59.     "Loss" is defined to mean those sums Giant Eagle becomes "legally obligated to pay as settlements or judgments in connection with a covered **claim**.  **Loss** shall include expenses incurred to investigate a **claim** or defend a **suit** if so provided in the **scheduled underlying insurance**."

60.     "Scheduled underlying insurance" means the "policy or policies of insurance shown in the Schedule of Underlying Insurance forming a part of this policy."

61.     The Schedules of Underlying Insurance in the XL Specialty Policies identify the following insurance policies issued to Giant Eagle by Old Republic during the corresponding policy period between April 1, 2016 through April 1, 2018 (the "Old Republic Policies").  These Old Republic Policies are not attached to this Complaint because they are voluminous and, on information and belief, are in the Defendants' possession.  Each of these policies is identified in the chart below, and the terms and conditions of each policy are incorporated herein by reference:

| POLICY NUMBER | POLICY PERIOD |
|---|---|
| MWZY 307316 | April 1, 2016 to April 1, 2017 |
| MWZY 310036 | April 1, 2017 to April 1, 2018 |

62.     The XL Specialty policies provide that XL Specialty "will have the right and duty to defend any **suit** covered by Insuring Agreement A, but only if the actual payment of **loss** to which this policy applies, by you or insurers providing **scheduled underlying insurance** exceeds the limits of the **scheduled underlying insurance** . . ."

63.     The **scheduled underlying insurance** does include expenses incurred to investigate a claim or defend a suit.

64.     Specifically, each of the Old Republic policies identified in the Schedules of Underlying Insurance of the XL Excess Policies contains a "SELF INSURED RETENTION ENDORSEMENT (SUPPLEMENTARY PAYMENTS/ALAE PRO RATA)" (the "Defense Costs Pro Rata Endorsements").  These Defense Costs Pro Rata Endorsements each provide that: "In addition to the Scheduled 'self-insured retention' you [Giant Eagle] are responsible for payment of a proportion of Supplementary Payments and/or allocated loss adjustment expenses. Your proportion is equal to the ratio that the 'self-insured retention' amount bears to the damages and medical expenses paid. If there is no loss payment, your proportion of Supplementary Payments and/or allocated loss adjustment expenses is 100%."  These Defense Costs Pro Rata Endorsements further provide that Old Republic has a duty to defend "any claim or 'suit' that exceeds the 'self-insured retention.'"

65.     Giant Eagle and Old Republic separately entered into a Program Agreement that superseded, as between Giant Eagle and Old Republic, but did not modify, the Defense Costs Pro Rata Endorsements.  The Program Agreement is not listed in the Schedules of Underlying Insurance of, and does not form a part of, the XL Excess Policies.

66.     Giant Eagle has paid more than $2 million defending against the Opioid Lawsuits. These amounts constitute payment of **loss** under the XL Excess Policies because each of the Old Republic policies identified in the Schedules of Underlying Insurance of the XL Excess Policies contains a defense obligation.  Therefore, XL's duty to defend has been triggered by Giant Eagle's payment of $2 million in defense costs.

**C.     THE OPIOID LAWSUITS' ALLEGATIONS EASILY MEET THE STANDARD FOR TRIGGERING DEFENDANTS' DUTY TO DEFEND – THAT IS, THEY ASSERT ARGUABLY COVERED CLAIMS**

67.     Giant Eagle provided timely notice of each of the Opioid Lawsuits to Zurich and XL Specialty.

68.     The Opioid Lawsuits allege facts and causes of action that are covered or at least arguably covered by Defendants' Policies.

69.     Each of the Zurich and XL Excess Policies obligates Defendants to "pay those sums that [Giant Eagle] becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies."

70.     Each of the Zurich and XL Excess policies applies to "bodily injury" caused by an "occurrence"  that occurs during the policy period.

71.     Each of Defendants' Policies defines "bodily injury" to mean "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

72.     "Damages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury.'"

73.     Each of Defendants' policies define "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

74.     The Opioid Lawsuits allege that HBC breached duties owed to the underlying plaintiffs by, among other things, negligently failing to: (a) identify suspicious orders of prescription opioids; (b) maintain effective controls against diversion; and (c) halt suspicious orders when they were identified.  The underlying plaintiffs allege that Giant Eagle's negligence contributed to the opioid public health crisis in the underlying plaintiffs' respective communities and caused "bodily injury," as that term is defined in the Defendants' Policies.

75.     As a result of that bodily injury – "because of bodily injury" in the language of Defendants' Policies – the underlying plaintiffs allege that they have been damaged by incurring increased costs to care for and treat their citizens' opioid addictions.

76.     HBC is an Insured under Defendants' Policies because it is both an operating division of Giant Eagle and expressly identified as a Named Insured in many of the Policies.

77.     Defendants have no reasonably justified basis to deny their respective duties to defend against the Opioid Lawsuits and must comply with their duties immediately.

78.     Yet Defendants have refused to provide Giant Eagle with a defense or reimburse any of Giant Eagle's defense costs in the Opioid Lawsuits.

79.     Each Defendant has a separate and independent duty to investigate and respond promptly and fully to Giant Eagle's claim, and each Defendant has breached that duty.

80.     On January 29, 2019, Giant Eagle's outside counsel wrote to Zurich and XL Specialty and demanded that Zurich and XL Specialty each set forth, separately and in writing, its coverage position regarding the Opioid Lawsuits.

81.     Three months after receiving Giant Eagle's written demand, Zurich sent a letter on April 23, 2019, denying coverage for the Opioid Lawsuits.  (Zurich earlier had issued a generic reservation of rights with respect to the Opioid Lawsuits in December 2018 without addressing the merits of the claim, and promised that it was investigating the claims.)

82.     Zurich denied coverage based on the contention that the Opioid Lawsuits do not seek damages because of any "bodily injury" or "property damage" caused by an "occurrence," as those terms are defined in the Zurich Policies.  Zurich's contention is mistaken, and many courts have found that policyholders are entitled to a defense from their liability insurers against governmental claims seeking damages because of alleged negligence in the distribution of opioids, which are potentially covered claims "because of bodily injury" caused by an "occurrence," as defined in such policies.

83.     Zurich also contends that "the complaints allege that Giant Eagle . . . acted purposely by misrepresenting the safety of their opioid products to increase profits; this conduct is not accidental or an 'occurrence' under the terms of the Old Republic Primary Policies."  This contention is baseless because Giant Eagle makes no opioid products, and none of the Opioid Lawsuits allege that Giant Eagle has made any misrepresentations regarding the safety of opioids.

84.     On June 27, 2019, XL Specialty first acknowledged notice of the Opioid Lawsuits.  XL Specialty reserved its rights with regard to the tender of the Opioid Lawsuits, and XL Specialty has not agreed to honor its defense obligation.

20

## FIRST CAUSE OF ACTION

(Against All Defendants)

(Declaratory Relief – Duty to Defend and Pay All Defense Expenses in the Opioid Lawsuits)

85.     Giant Eagle repeats and realleges the allegations set forth in the preceding paragraphs 1-xx of this Complaint and Demand for Jury Trial as if set forth fully herein.

86.     The Opioid Lawsuits seek covered or potentially covered damages because of bodily injury to which Defendants' insurance policies apply.

87.     Defendants each have a duty to defend Giant Eagle against the Opioid Lawsuits, subject only to their respective limits of liability.

88.     Defendants have denied or refused to acknowledge coverage, including their duty to defend, for the Opioid Lawsuits under their respective Policies.

89.     Under 28 U.S.C. § 2201, there is an actual and justiciable controversy between Giant Eagle and Defendants with respect to Defendants' duties to defend Giant Eagle under their respective Policies.

90.     Speedy and effective relief is necessary to protect and preserve Giant Eagle's rights with respect to Defendants' duties to defend Giant Eagle under their respective Policies.  A declaratory judgment establishing the parties' rights with respect to those duties to defend would terminate the controversy and dispute among the parties as to those duties to defend.

91.     All persons who have any claims or interests in the subject matter of this action – namely, Defendants' duties to defend Giant Eagle under their respective Policies – and who would be affected by the requested declaratory relief are parties to this action.

92.     Pursuant to 22 U.S.C. § 2201, and the terms of Defendants' respective Policies, Giant Eagle is entitled to a declaration of its rights and Defendants' duties under the policies,

including a declaration that Defendants have a duty to defend Giant Eagle against the Opioid Lawsuits.

## SECOND CAUSE OF ACTION

(Against All Defendants)

(Breach of Contract – Duty to Defend and Pay All Defense Expenses in the Opioid Lawsuits)

93.     Giant Eagle repeats and realleges the allegations set forth in preceding paragraphs 1-xx of this Complaint and Demand for Jury Trial as if set forth fully herein.

94.     Giant Eagle timely tendered the Opioid Lawsuits for defense under the Defendants' Policies.

95.     The Opioid Lawsuits contain covered or potentially covered allegations of Giant Eagle's negligence, breach of duty, and unintentional failure to maintain effective controls against diversion of opioid medicines or to halt suspicious orders.

96.     The Opioid Lawsuits allege covered or potentially covered damages because of bodily injury to which the Defendants' Policies apply.

97.     These allegations trigger Zurich's and XL Specialty's respective duty to defend Giant Eagle against the Opioid Lawsuits.

98.     Zurich and XL Specialty have denied or otherwise refused to acknowledge their duties to defend Giant Eagle against the Opioid Lawsuits, in breach of their policies.

99.     As a direct and proximate result of the breaches by Zurich and XL Specialty of their respective duties to defend Giant Eagle against the Opioid Lawsuits, Giant Eagle has been damaged.

**THIRD CAUSE OF ACTION**

(Against All Defendants)

(Common Law Bad Faith)

100.     Giant Eagle hereby repeats and incorporates by reference paragraphs 1-xxx of this Complaint and Demand for Jury Trial as if fully set forth herein.

101.     As alleged above, XL Specialty and Zurich each agreed under the terms and conditions of their respective Policies to insure Giant Eagle for "those sums that [Giant Eagle] becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this [insurance] applies."

102.     Implied in every insurance policy is a covenant that the insurance company will act in good faith and deal fairly with its insured, that the insurance company will do nothing to interfere with the right to receive benefits under the policy, that the insurance company will give at least as much consideration to the interests of the insured as it does its own interests, that the insurance company will exercise diligence, good faith and fidelity in safeguarding the insured's interests, that it will deal ethically with the insured and will fairly and adequately inform the insured with respect to the nature and scope of its insurance coverage.

103.     XL Specialty and Zurich have violated their duties of good faith owed to Giant Eagle by (i) refusing to acknowledge their duties to defend provided under their respective Policies without reasonable justification, (ii) repudiating or otherwise refusing their respective duties to defend Giant Eagle for reasons that are manifestly unreasonable under the terms and conditions of their Policies, and (iii) failing to timely and adequately investigate and process Giant Eagle's claim for a defense.  XL Specialty and Zurich each has done so for the purpose of consciously, purposefully, and maliciously withholding policy benefits and placing their own

23

interests above those of their insured for the purpose of saving money which should have been paid for Giant Eagle's defense under the terms and conditions of the Policies.

104.    Giant Eagle is informed and believes, and on that basis alleges, that XL Specialty's and Zurich's actions and failures to act were done purposefully, intentionally, maliciously, and/or with conscious disregard of their respective obligations under the Policies, that their conduct was despicable and intended to cause injury to Giant Eagle and deprive it of its rights under each of their Policies, and that their actions and inactions have been taken with willful and conscious disregard of Giant Eagle's rights and the consequences of these actions on Giant Eagle, and with the deliberate intent to vex, injure and annoy Giant Eagle and advance the Insurers' own pecuniary interest.  XL Specialty and Zurich each knew that their conscious disregard for Giant Eagle's rights caused a great probability of substantial harm to their insured.

105.    Among other acts or failure to act, XL Specialty and Zurich each has  breached its duty of good faith and fair dealing with respect to Giant Eagle by:

> a.   failing to deal fairly with Giant Eagle and failing to give equal consideration in all matters to Giant Eagle's interests;
>
> b.   engaging in unreasonable, frivolous, arbitrary or untenable withholding of a defense due Giant Eagle under the Policies;
>
> c.   in Zurich's case, misrepresenting and mischaracterizing the allegations against Giant Eagle and the nature of Giant Eagle's participation in the pharmaceutical industry in an effort to fit the claims against Giant Eagle into the language of plainly inapplicable Policy exclusions so as to avoid Zurich's clear duty to defend;

d.   compelling Giant Eagle to defend itself against the Opioid Lawsuits without the benefit of a defense provided by XL Specialty and Zurich;

e.   compelling Giant Eagle to formulate a litigation and settlement strategy with respect to the Opioid Lawsuits without the benefit of the defense required under each of the Policies issued by XL Specialty and Zurich;

f.   compelling Giant Eagle to institute, continue, and/or submit to litigation to recover amounts due under their respective Policies; and

g.   failing to promptly investigate the Opioid Lawsuits and provide Giant Eagle with a prompt defense or determination of its right to a defense under the Policies.

106.   The actions and inactions of XL Specialty and Zurich each were taken for the purpose of consciously withholding policy benefits and placing their own interests above those of their insured for the purpose of saving money which should have been paid for Giant Eagle's defense under the terms and conditions of the Policies.

107.   The actions and inactions of XL Specialty and Zurich, as set forth above, are without any reasonable justification, were undertaken in bad faith, and constitute a breach of their duties of good faith and fair dealing.  As a result of this breach of their duties of good faith, Giant Eagle is entitled to an award of compensatory damages against XL Specialty and Zurich, as well as punitive damages and attorneys' fees.

## FOURTH CAUSE OF ACTION

(Against All Defendants)

(Statutory Bad Faith)

108.     Giant Eagle hereby repeats and incorporates by reference paragraphs 1-xxx of this Complaint and Demand for Jury Trial as if fully set forth herein.

109.     42 Pa. Cons. Stat. § 8371 ("Section 8371") provides specific statutory relief to, *inter alia*, an insured in an action between the insured and an insurer arising under an insurance policy if the insurer has acted in bad faith toward the insured.

110.     Pursuant to Section 8371, "bad faith" can be evidenced by, *inter alia*, an insurer's frivolous or unfounded refusal to pay, its lack of investigation into the facts of a claim or its failure to communicate with the insured.  A "bad faith" claim can also be evidenced by circumstances showing that the insurer lacked a reasonable basis for denying, or unreasonably delaying payment of, the insured's claim for insurance benefits, and that the insurer knew or recklessly disregarded its lack of a reasonable basis for denying, or unreasonably delaying payment of, the insured's claim for insurance benefits.

111.     As alleged above, XL Specialty and Zurich each agreed under the terms and conditions of their respective Policies to insure Giant Eagle for "those sums that [Giant Eagle] becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this applies."

112.     An insurance company has a duty to act with the utmost good faith towards its policyholders.

113.     Implied in every insurance policy is a covenant that the insurance company will act in good faith and deal fairly with its insured, that the insurance company will do nothing to

26

interfere with the insured's right to receive benefits under the policy, that the insurance company will give at least as much consideration to the interests of the insured as it does its own interests, that the insurance company will exercise diligence, good faith and fidelity in safeguarding the insured's interests, that it will deal ethically with the insured and will fairly and adequately inform the insured with respect to the nature and scope of its insurance coverage (hereinafter, the "implied covenant of good faith and fair dealing").

114.    XL Specialty and Zurich in tortious violation of their duties of good faith and fair dealing, have each refused to acknowledge the duty to defend provided under their respective Policies by repudiating or otherwise refusing their duties to defend Giant Eagle for reasons that are unsubstantiated under the terms and conditions of their Policies.  XL Specialty and Zurich has each done so for the purpose of consciously withholding policy benefits and placing their own interests above those of their insured for the purpose of utilizing money which should have been paid under the terms and conditions of the Policies.

115.    Giant Eagle is informed and believes, and on that basis alleges, that XL Specialty's and Zurich's actions and failures to act were done purposefully, intentionally, maliciously, and/or with reckless disregard of their obligations under their respective Policies, that their conduct was despicable and intended to cause injury to Giant Eagle and deprive it of its rights under their respective Policies, and that their actions and inactions have been taken with willful and conscious disregard of Giant Eagle's rights and the consequences of these actions on Giant Eagle, and with the deliberate intent to vex, injure and annoy Giant Eagle and advance the insurers' own pecuniary interest.

116.    Among other acts or failure to act, XL Specialty and Zurich each has  breached the duty of good faith and fair dealing with respect to Giant Eagle by:

27

a.  failing to deal fairly with Giant Eagle and failing to give equal consideration in all matters to Giant Eagle's interests;

b.  engaging in unreasonable, frivolous, or untenable withholding of policy benefits;

c.  compelling Giant Eagle to defend the Opioid Lawsuits without the benefit of a defense provided by XL Specialty and Zurich;

d.  compelling Giant Eagle to formulate a litigation and settlement strategy with respect to the Opioid Lawsuits without the benefit of a defense as required under each of the Policies issued by XL Specialty and Zurich;

e.  compelling Giant Eagle to institute, continue, and/or submit to litigation to recover amounts due under their respective Policies; and

f.  failing to promptly investigate the Opioid Lawsuits and provide a prompt defense or determination of Giant Eagle's right to a defense under the Policies.

117.    Giant Eagle is informed and believes, and on that basis alleges, that in taking such actions, XL Specialty and Zurich each has been guilty of bad faith under Pennsylvania law, in that their past and present conduct is despicable and intended to cause injury to Giant Eagle and deprive it of its rights under their respective Policies and was carried on by them with a willful and conscious disregard of Giant Eagle's rights and the consequences of these actions on Giant Eagle, and with the deliberate intent to vex, injure and annoy Giant Eagle and advance their own pecuniary interests.

118.     As a result of the bad faith of XL Specialty and Zurich, Giant Eagle has suffered and will continue to suffer substantial monetary damages, including compensatory damages in the amount of unpaid insurance claims.  In addition, Giant Eagle is entitled to an award of exemplary damages in such amount as is sufficient to punish XL Specialty and Zurich for their willful and tortious actions, as well as special statutory interest and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Giant Eagle prays for relief as follows:

(a)     On the First Cause of Action, Giant Eagle requests that the Court determine and resolve this controversy by entering a Declaratory Judgment declaring that Defendants are obligated to defend Giant Eagle against the Opioid Lawsuits, as well as any future lawsuits filed against Giant Eagle alleging the same or similar claims;

(b)     On the Second Cause of Action, Giant Eagle requests that the Court enter judgment against XL Specialty and Zurich for actual money damages in an amount in excess of $75,000 to be determined at trial, for breaches of their respective duties to defend under the Policies, including pre-judgment and post-judgment interest as allowed by common and statutory law, and such other and further relief as the Court deems just and proper;

(c)     On the Third Cause of Action, Giant Eagle requests that the Court enter judgment against XL Specialty and Zurich for actual money damages in an amount in excess of $75,000 to be determined at trial for their breaches of the duty of good faith and fair dealing, including compensatory damages, punitive damages, attorneys' fees and pre-judgment and post-judgment interest as allowed by common and statutory law, and such other and further relief as the Court deems just and proper; and

29

(d)     On the Fourth Cause of Action, Giant Eagle requests that the Court enter judgment against XL Specialty and Zurich in an amount in excess of $75,000 for attorneys' fees and costs, punitive damages, compensatory and consequential damages, interest, special statutory interest, and such other and further relief as the Court deems just and proper.

## JURY DEMAND

Giant Eagle demands a trial by jury on all issues so triable.

DATED:  July 25, 2019                     MARCUS & SHAPIRA LLP

By:     */s/ Scott D. Livingston*_____
        Scott D. Livingston (PA ID No. 60649)
        livingston@marcus-shapira.com
        Robert M. Barnes (PA ID No. 58655)
        rbarnes@marcus-shapira.com
        301 Grant Street, 35th Floor
        One Oxford Centre
        Pittsburgh, PA  15219-6401
        Tel: (412) 471-3490


        MILLER FRIEL, PLLC

By:     */s/ Bernard P. Bell*_____
        Bernard P. Bell (*pro hac vice* admission forthcoming)
        bellb@millerfriel.com
        Brian G. Friel (*pro hac vice* admission forthcoming)
        frielb@millerfriel.com)
        Tab R. Turano (*pro hac vice* admission forthcoming)
        turanot@millerfriel.com
        1200 New Hampshire Avenue NW
        Suite 800
        Washington, DC  20036
        Tel: (202) 760-3160

30