**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| GIANT EAGLE, INC. and HBC SERVICE COMPANY, | ) | |
| | ) | |
| | ) | |
| Plaintiffs and Counter Defendants, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:19-cv-00904-AJS |
| | ) | Hon. Arthur J. Schwab |
| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY and XL SPECIALTY INSURANCE COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendants and Counter Claimants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, | ) | |
| | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OLD REPUBLIC INSURANCE COMPANY, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| | ) | |
| | ) | |
| XL SPECIALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OLD REPUBLIC INSURANCE COMPANY, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

**AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY AND XL
SPECIALTY INSURANCE COMPANY'S JOINT RESPONSE TO GIANT EAGLE'S
STATEMENT OF MATERIAL FACTS AND SUPPLEMENTAL CONCISE
STATEMENT OF MATERIAL FACTS, AND AMERICAN GUARANTEE AND**

**LIABILITY INSURANCE COMPANY AND XL SPECIALTY INSURANCE COMPANY'S CONCISE STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to LCvR 56.B.1, Defendants/Counterclaimants American Guarantee and Liability Insurance Company ("AGLIC") and XL Specialty Insurance Company ("XL") hereby respond to Plaintiff/Counterdefendants Giant Eagle, Inc. and HBC Service Company's (collectively, "Giant Eagle") Statement of Material Facts (Doc. 77) as follows:

1.      Old Republic Insurance Company sold Giant Eagle a series of Commercial General Liability Policies, including Policy No. MWZY 304638 for the period of April 1, 2015 to April 1, 2016 (the "2016 Old Republic Policy") and Policy No. MWZY 307316 for the period of April 1, 2016 to April 1, 2017 (the "2017 Old Republic Policy"). *See* **Exhibits 3** & **4** to the Appendix.

**RESPONSE: AGLIC and XL admit only that Giant Eagle attached to its Appendix of Exhibits Cited In Support of Giant Eagle's Motion for Partial Summary Judgment on the Duty to Defend (Doc. 77-1 (the "Appendix")) as Exhibits 3 and 4, respectively, Policy No. MWZY 304638 for the period of April 1, 2015 to April 1, 2016 (the "2016 Old Republic Policy") and Policy No. MWZY 307316 for the period of April 1, 2016 to April 1, 2017 (the "2017 Old Republic Policy"), which Giant Eagle purports are "true and correct cop[ies]" of those policies (Doc. 77-13 at ¶¶ 6-7). AGLIC and XL lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1. To the extent Paragraph 1 references other policies Old Republic issued to Giant Eagle that are not at issue in Giant Eagle's Motion for Partial Summary Judgment ("Motion"), AGLIC and XL dispute that this is a material "fact."**

2.      The 2016 Old Republic Policy and the 2017 Old Republic Policy are referred to collectively as the "Old Republic Policies."

**RESPONSE**: AGLIC and XL admit that Giant Eagle references what it defines as the 2016 Old Republic Policy and the 2017 Old Republic Policy as the "Old Republic Policies." AGLIC and XL dispute that this is a material "fact."

3.     The Old Republic Policies each provide a $1 million per occurrence limit of liability, subject to a $1 million self-insured retention ("SIR") and a deductible equal to "the Limits of Insurance/Liability . . . plus all ALAE/Supplementary payments." *See* **Exhibits 3** & **4** (Old Rep. Policies, Total Aggregate Limit and Designated Location(s) Aggregate Limit End.; Scheduled Deductible End.; Self Insured Retention Endorsement (Supplementary Payments/ALAE Pro Rata)).

**RESPONSE**: AGLIC and XL admit that the Old Republic Policies each contain a Total Aggregate Limit and Designated Location(s) Aggregate Limit Endorsement, a Scheduled Deductible Endorsement ("Deductible Endorsement"), and a Self Insured Retention Endorsement ("SIR Endorsement") and that Paragraph 3 contains certain quoted language from the Deductible Endorsement. AGLIC and XL admit that the Commercial General Liability Coverage Form in each of the Old Republic Policies provides a $1 million per occurrence limit, subject to a $1 million SIR and a deductible equal to "the Limit of Insurance/Liability as provided under the policy plus all ALAE/Supplementary Payments" and state that Giant Eagle's SIR and deductible obligations are on a per occurrence basis (Doc. 77-4 at pp. 19, 21, 45; Doc. 77-5 at pp. 16, 18, 42) AGLIC and XL further state that the Old Republic Policies speak for themselves and deny any allegations inconsistent therewith.

4.     The terms of the SIR and deductible endorsements provide that the SIR and deductible may be satisfied by payment by Giant Eagle of (a) damages or (b) "other amounts payable under the policy," and that "amounts payable under Supplementary Payments, which include but are not limited to allocated loss adjustment expense(s) (ALAE) *do not* satisfy the self-insured retention" or the deductible. *See* **Exhibits 3** & **4** (Old Rep. Policies, Scheduled Deductible End.; Self Insured Retention Endorsement (Supplementary Payments/ALAE Pro Rata)).

**RESPONSE: AGLIC and XL admit that the Old Republic Policies each contain SIR and Deductible Endorsements and that Paragraph 4 quotes certain modified language from those endorsements without noting the modifications, including italicizing the words "do not." AGLIC and XL state that the Old Republic Policies speak for themselves and deny any allegations inconsistent therewith.**

5.     The Old Republic Policies state:

If Supplementary Payments and/or allocated loss adjustment expense(s) are not described in the policy, Supplementary Payments and/or allocated loss adjustment expense(s) are costs associated with the investigation or settlement of any claim or "suit" against an insured and include but are not limited to defense costs, attorneys' fees . . .

*See* **Exhibits 3** & **4** (Old Rep. Policies, Scheduled Deductible End.; Self Insured Retention Endorsement (Supplementary Payments/ALAE Pro Rata)).

**RESPONSE: AGLIC and XL admit that the Old Republic Policies each contain SIR and Deductible Endorsements and that Paragraph 5 quotes certain language from those endorsements. AGLIC and XL state that the Old Republic Policies speak for themselves and deny any allegations inconsistent therewith.**

6.     The Self insured Retention Endorsement in the Old Republic Policies provides that "[t]he 'self insured retention' will not reduce the applicable Limits of insurance (Limits of Liability)." *See* **Exhibits 3** & **4** (Old Rep. Policies, Self Insured Retention Endorsement (Supplementary Payments/ALAE Pro Rata)).

**RESPONSE: AGLIC and XL admit that the Old Republic Policies each contain SIR Endorsements and that Paragraph 6 quotes certain modified language from those endorsements. AGLIC and XL state that the Old Republic Policies speak for themselves and deny any allegations inconsistent therewith.**

7.     The Deductible Endorsement in the Old Republic Policies provides that amounts that satisfy the deductible "will reduce the applicable Limits of Insurance/Limits of Liability." *See* **Exhibits 3** & **4** (Old Rep. Policies, Scheduled Deductible End.).

**RESPONSE: AGLIC and XL admit that the Old Republic Policies each contain Deductible Endorsements and that Paragraph 7 quotes certain language from those endorsements. AGLIC and XL state that the Old Republic Policies speak for themselves and deny any allegations inconsistent therewith.**

8.      The Old Republic Policies provide that Old Republic "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *See* **Exhibits 3** and **4** (Old. Rep. Policies, Section 1.A.1.a).

**RESPONSE: AGLIC and XL admit that Paragraph 8 quotes certain language from the Old Republic Policies. AGLIC and XL state that the Old Republic Policies speak for themselves and deny any allegations inconsistent therewith.**

9.      The Old Republic Policies provide: "We will have the right and duty to defend the insured against any 'suit' seeking those damages." *See* **Exhibits 3** and **4** (Old Rep. Policies, Section 1.A.1.a).

**RESPONSE: AGLIC and XL admit that Paragraph 9 quotes certain language from the Old Republic Policies. AGLIC and XL state that the Old Republic Policies speak for themselves and deny any allegations inconsistent therewith.**

10.     The Old Republic Policies define "bodily injury" to mean "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *See* **Exhibits 3** and **4** (Old Rep. Policies, Section V.3).

**RESPONSE: AGLIC and XL admit that Paragraph 10 quotes certain language from the Old Republic Policies. AGLIC and XL state that the Old Republic Policies speak for themselves and deny any allegations inconsistent therewith.**

11.     The Old Republic Policies apply to bodily injury if "(1) The 'bodily injury' . . . is caused by an 'occurrence' that takes place in the 'coverage territory'" and (2) "the 'bodily injury' . . . occurs during the policy period . . ." **Exhibits 3** and **4** (Old Rep. Policies, Section I.A.1.b.(1)-(2)).

**RESPONSE: AGLIC and XL admit that Paragraph 11 quotes certain modified language from the Old Republic Policies. AGLIC and XL state that the Old Republic Policies speak for themselves and deny any allegations inconsistent therewith.**

12.     The Old Republic Policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *See* **Exhibits 3** and **4** (Old Rep. Policies, Section V.13).

**RESPONSE: AGLIC and XL admit that Paragraph 12 quotes certain language from the Old Republic Policies. AGLIC and XL state that the Old Republic Policies speak for themselves and deny any allegations inconsistent therewith.**

13.     The Old Republic Policies provide that "[d]amages because of 'bodily injury' include damages claimed by any person *or organization* for care, loss of services or death resulting at any time from the 'bodily injury.'" **Exhibits 3** and **4** (Old Rep. Policies, Section I.A.1.e) (emphasis supplied).

**RESPONSE: AGLIC and XL admit that Paragraph 13 quotes certain modified language from the Old Republic Policies. AGLIC and XL state that the Old Republic Policies speak for themselves and deny any allegations inconsistent therewith.**

14.     The Old Republic Policies describe Supplementary Payments as follows:

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a.      All expenses we incur.

b.      Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c.      The cost of bonds to release attachments, but only for bond amounts within the applicable limits of insurance. We do not have to furnish these bonds.

d.      All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit",

including actual loss of earnings up to $250 a day because of time off from work.

e.  All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f.  Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g.  All interest on the full amount of any judgment that accrues after entry of the judgment and before we gave paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

*See* **Exhibits 3** and **4** (Old Rep. Policies, Section I – Supplementary Payments) (the "Supplementary Payments Provision").

**RESPONSE: AGLIC and XL admit that Paragraph 14 quotes certain language from the Old Republic Policies. AGLIC and XL state that the Old Republic Policies speak for themselves and deny any allegations inconsistent therewith.**

15.  This Supplementary Payments Provision in the Old Republic Policies does not include defense costs incurred in defense of covered "suits" against Giant Eagle. *See* **Exhibits 3** and **4** (Supplementary Payments Provision).

**RESPONSE: Denied. The Old Republic policies contain a duty to defend" Giant Eagle. (***See* **Giant Eagle's SOF 9; Doc. 76, at p. 2 n. 1, p. 13.) That means Old Republic may become obligated to incur defense expenses after Giant Eagle first satisfies the SIR. While defense expenses ultimately become the responsibility of Giant Eagle pursuant to the terms of its Program Agreement with Old Republic (Doc. 76, at p. 14 n. 11; Doc. 77-12), they are Old Republic's obligations to incur. (Doc. 77-4, at p. 29; Doc. 77-5, at p. 26.) Under the terms of the Old Republic Policies, "[a]ll expenses [Old Republic] incur[s]" with respect to**

**any claim it defends are included within "Supplementary Payments." (Doc. 77-4, at p. 36;**

**Doc. 77-5, at p. 51.)**

16.     American Guarantee and Liability Insurance Company ("AGLIC") sold Giant Eagle Commercial Umbrella Liability Policy, No. AUC 2856587-17 for the period of April 1, 2015 to April 1, 2016 (the "AGLIC Policy"). *See* **Exhibit 1** to the Appendix.

**RESPONSE: AGLIC admits that it issued Giant Eagle Commercial Umbrella**

**Liability Policy, No. AUC 2856587-17 for the period of April 1, 2015 to April 1, 2016 (the**

**"AGLIC Policy"). XL lacks knowledge or information sufficient to form a belief as to the**

**truth of the allegations in Paragraph 16 and disputes that the allegations in Paragraph 16**

**are material to Giant Eagle's Motion as it concerns XL.**

17.     The AGLIC Policy identifies the 2016 Old Republic Policy as **underlying insurance**. *See* **Exhibit 1** (AGLIC Policy, Section V. Definitions. A.7; Schedule of Underlying Insurance).

**RESPONSE: AGLIC admits that the AGLIC Policy identifies the 2016 Old**

**Republic Policy as "underlying insurance." XL lacks knowledge or information sufficient**

**to form a belief as to the truth of the allegations in Paragraph 17 and disputes that the**

**allegations in Paragraph 17 are material to Giant Eagle's Motion as it concerns XL.**

18.     Under **Coverage A**, the AGLIC policy states: "we will pay on behalf of the **insured** those damages covered by this insurance in excess of the total applicable limits of **underlying insurance**" and "[w]ith respect to **Coverage A**, this policy includes . . . [t]he terms and conditions of **underlying insurance** to the extent such terms and conditions are not inconsistent or do not conflict with the terms and conditions referred to in Paragraph 2. below . . ." *See* **Exhibit 1** (AGLIC Policy, Section I.A). The AGLIC Policy separately defines the term "loss" under Coverage A to "include[] defense expenses and supplementary payments if underlying insurance includes defense expenses and supplementary payments in the Limits of Insurance." *See id* at Section V.A.3.a.(1)

**RESPONSE: AGLIC admits that the AGLIC Policy contains the language quoted**

**with modifications in Paragraph 18. AGLIC states that the AGLIC Policy speaks for itself**

**and denies any allegations inconsistent therewith. XL lacks knowledge or information**

**sufficient to form a belief as to the truth of the allegations in Paragraph 18 and disputes**

**that the allegations in Paragraph 18 are material to Giant Eagle's Motion as it concerns**

**XL.**

19.     The AGLIC Policy provides that AGLIC shall "have the right and duty to assume control of the investigation and settlement of any claim, or defense of any **suit** against the **insured** for damages covered by this policy . . . [u]nder Coverage A, when the applicable limit of **underlying insurance** . . . has been exhausted by payment of **loss** for which coverage is afforded under this policy . . ." *See* **Exhibit 1** (AGLIC Policy, Section III.A.1).

**RESPONSE: AGLIC admits that the AGLIC Policy contains the language quoted**

**with modifications in Paragraph 19. AGLIC states that the AGLIC Policy speaks for itself**

**and denies any allegations inconsistent therewith. XL lacks knowledge or information**

**sufficient to form a belief as to the truth of the allegations in Paragraph 19 and disputes**

**that the allegations in Paragraph 19 are material to Giant Eagle's Motion as it concerns**

**XL.**

20.     XL Specialty Insurance Company ("XL") sold Giant Eagle Commercial Excess Follow Form and Umbrella Liability Policy, No. US00074903LI16A for the period of April 1, 2016 to April 1, 2017 (the "XL Policy"). *See* **Exhibit 2** to the Appendix.

**RESPONSE: XL admits that it issued Giant Eagle Commercial Excess Follow Form**

**and Umbrella Liability Policy, No. US00074903LI16A for the period of April 1, 2016 to**

**April 1, 2017 (the "XL Policy"). AGLIC lacks knowledge or information sufficient to form**

**a belief as to the truth of the allegations in Paragraph 20 and disputes that the allegations**

**in Paragraph 20 are material to Giant Eagle's Motion as it concerns AGLIC.**

21.     The XL Policy identifies the 2017 Old Republic Policy as **scheduled underlying insurance**. *See* **Exhibit 2** (XL Policy, Section VI. Definitions (JJ); Schedule of Underlying Insurance).

**RESPONSE: XL admits that the XL Policy identifies the 2017 Old Republic as "scheduled underlying insurance." XL further states that the XL Policy's Schedule of Underlying Insurance identifies the limits of the 2017 Old Republic Policy and expressly states: "Defense expenses are in addition to the limits." (Doc. 77-3, p. 16.) AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 and disputes that the allegations in Paragraph 21 are material to Giant Eagle's Motion as it concerns AGLIC.**

22.     The XL Policy provides: "Coverage under this Insuring Agreement A shall follow the terms, definitions, conditions and limitations of the **scheduled underlying insurance**, subject to the **policy period**, Limits of Insurance, premium, and any contrary provisions contained in this policy." *See* **Exhibit 2** (XL Policy, Section I(A)(2)). The XL Policy separately defines "loss" to include "expenses incurred to investigate a claim or defend a suit if so provided in the scheduled underlying insurance." *Id.* at Section VI(V).

**RESPONSE: XL admits that Paragraph 22 quotes certain language from the XL Policy. However, XL states that Paragraph 22 fails to include the entire definition of "loss" contained in the XL Policy, as the XL Policy defines "loss" to mean "those sums you become legally obligated to pay as settlements or judgments in connection with a covered claim. Loss shall include expenses incurred to investigate a 'claim' or defend a 'suit' if so provided in the 'scheduled underlying insurance.'" (Doc. 77-3 at p. 34.) XL further states that the XL Policy speaks for itself and denies any allegations inconsistent therewith. AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 and disputes that the allegations in Paragraph 22 are material to Giant Eagle's Motion as it concerns AGLIC.**

23.     The XL Policy provides that XL shall "have the right and duty to defend any **suit** covered by Insuring Agreement A, but only if the actual payment of **loss** to which this policy applies, by you or insurers providing **scheduled underlying insurance** exceed the limits of the

scheduled underlying insurance . . ." *See* **Exhibit 2** (Amendment to Insuring Agreement A and Defense Provisions Endorsement With Shaving of Limits Provision).

> **RESPONSE**: XL admits that Paragraph 23 quotes certain language from the XL Policy. However, XL states that the complete language of the provision quoted in Paragraph 23 states that XL "will have the right and duty to defend any 'suit' covered by Insuring Agreement A, but only if the actual payment of 'loss' to which this policy applies, by you or insurers providing 'scheduled underlying insurance' exceeds the limits of the 'scheduled underlying insurance' and any applicable and collectible 'other insurance.'" (Doc. 77-3 at p. 47.) XL further states that the XL Policy speaks for itself and denies any allegations inconsistent therewith. AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 and disputes that the allegations in paragraph 23 are material to the claims against it.

24.     Giant Eagle has been named as a defendant in multiple lawsuits by plaintiffs seeking to recover damages for alleged harm from Giant Eagle's distribution of prescription opioids, including *County of Cuyahoga, Ohio v. Purdue Pharma L.P., et al.*, Case No 17-OP-45004 (N.D. Ohio) (the "*Cuyahoga* Action"); *County of Summit, Ohio v. Purdue Pharma L.P., et al.*, Case No 18-OP-45090 (N.D. Ohio) (the "*Summit* Action"); *Artz, et al. v. Endo Health Solutions, Inc., et al.*, Case No 19-op-45459 (N.D. Ohio) (the "*Artz* Action"); and *Frost, et. al. v. Endo Health Solutions, Inc., et al.*, Case No 18-op-46327 (N.D. Ohio) (the "*Frost* Action"). *See* **Exhibits 5** and **6** (*Cuyahoga* complaint), **Exhibits 7** and **8** (*Summit* complaint), **Exhibit 9** (*Artz* complaint) and **Exhibit 10** (*Frost* complaint) to the Appendix; Ross Decl. at ¶ 3 and Exh. A.

> **RESPONSE**: AGLIC and XL admit that Giant Eagle, Inc. and/or HBC Service Company are named as defendants in *County of Cuyahoga, Ohio v. Purdue Pharma L.P., et al.*, Case No 17-OP-45004 (N.D. Ohio) (the "*Cuyahoga* Action"); *County of Summit, Ohio v. Purdue Pharma L.P., et al.*, Case No 18-OP-45090 (N.D. Ohio) (the "*Summit* Action"); *Artz, et al. v. Endo Health Solutions, Inc., et al.*, Case No 19-op-45459 (N.D. Ohio) (the "*Artz* Action"); and *Frost, et. al. v. Endo Health Solutions, Inc., et al.*, Case No 18-op-46327 (N.D. Ohio) (the "*Frost* Action"). AGLIC and XL dispute that each of these complaints seeks

**relief only for alleged harm from Giant Eagle's distribution of prescription opioids, as the complaints also include allegations against Giant Eagle as an opioid dispenser and concern Giant Eagle operations at disparate locations in several states.** *See* **Giant Eagle's SOF 29 (citing Doc. 77-6 at ¶ 103; Doc. 77-8 at ¶ 107; Doc. 77-10 at ¶ 93; and Doc. 77-11 at ¶ 100);** *see also* **Doc. 77-6 at ¶ 109; Doc. 77-10 at ¶ 105; Doc. 77-11 at ¶ 112.**

25.     The *Cuyahoga*, *Summit*, *Artz* and *Frost* Actions are referred to collectively as the "Opioid Lawsuits," and have been transferred to the Opioid MDL. Ross Decl. at ¶ 3 and Exh. A.

**RESPONSE: AGLIC and XL admit that Giant Eagle references "Opioid Lawsuits" once in its Brief. (Doc. 76 at p. 6.) AGLIC and XL dispute that the "Opioid Lawsuits" consist of the *Cuyahoga*, *Summit*, *Artz*, and *Frost* Actions, as Giant Eagle references those actions differently throughout its Brief as the "Opioid Complaints." (Doc. 76 at p. 2, n. 1.) AGLIC and XL admit that the *Cuyahoga*, *Summit*, *Artz*, and *Frost* Actions have been transferred to the Opioid MDL. AGLIC and XL dispute that this is a material "fact."**

26.     The *Cuyahoga* and *Summit* Actions are further referred to as the "County Complaints."

**RESPONSE: AGLIC and XL admit that Giant Eagle references the *Cuyahoga* and *Summit* Actions as the "County Complaints" in its Brief. AGLIC and XL dispute that this is a material "fact."**

27.     The *Artz* and *Frost* Actions are further referred to as the "NAS Complaints."

**RESPONSE**: AGLIC and XL admit that Giant Eagle references the *Artz* and *Frost*

Actions as the "NAS Complaints" in its Brief. AGLIC and XL dispute that this is a

material "fact."

28.     The NAS Complaints incorporate by reference all of the factual allegations set forth in the *Summit* Action. *See* **Exhibit 9** (*Artz* at ¶ 392-93); **Exhibit 10** (*Frost* at ¶ 392-93).

**RESPONSE**: AGLIC and XL admit that the NAS Complaints "incorporate by

reference" the "common factual allegations set forth in the *Summit County* Pleadings."

AGLIC and XL further state that the NAS Complaints speak for themselves and deny any

allegations inconsistent therewith.

29.     Giant Eagle has been named as a "distributor" and a "pharmacy" defendant in both the County and NAS Complaints. *See, e.g.,* **Exhibit 5** (*Cuyahoga* at ¶ 103); **Exhibit 7** (*Summit* at ¶ 107); **Exhibit 9** (*Artz* at ¶93); **Exhibit 10** (*Frost* at ¶100).

**RESPONSE**: Admitted. AGLIC and XL further state that the NAS Complaints

speak for themselves and deny any allegations inconsistent therewith.

30.     The *Artz* and *Frost* Actions assert claims by legal guardians on behalf of putative classes of children diagnosed at birth with opioid dependence, known as Neonatal Abstinence Syndrome ("NAS"). *See* **Exhibit 9** (*Artz* at ¶¶ 1 n.1, 5-8); **Exhibit 10** (*Frost* at ¶¶ 1, 6-8).

**RESPONSE**: Denied. The *Artz* and *Frost* Actions assert claims by legal guardians on

behalf of putative classes of legal guardians of children diagnosed with NAS. AGLIC and

XL further state that the NAS Complaints speak for themselves and deny any allegations

inconsistent therewith.

31.     The NAS Complaints allege that the children in the putative class were each diagnosed at birth with opioid-related NAS as a result of the defendants' (including Giant Eagle's) conduct. *See, e.g.*, **Exhibit 9** (*Artz* at ¶1); **Exhibit 10** (*Frost* at ¶ 1).

**RESPONSE: Denied. The putative classes consist of legal guardians, not children. AGLIC and XL further state that the NAS Complaints speak for themselves and deny any allegations inconsistent therewith.**

32.    According to the NAS Complaints, NAS allegedly causes the NAS children to suffer an increased risk of developing a "constellation of symptoms," including growth retardation, poor fine motor skills, lower cognitive abilities, poor language development, brain damage, and muscular-skeletal disorders. *See* **Exhibit 9** (*Artz* at ¶¶ 119, 121, 445); **Exhibit 10** (*Frost* at ¶¶ 119, 121, 441).

**RESPONSE: AGLIC and XL admit that Paragraph 32 quotes certain language from the NAS Complaints. AGLIC and XL further state that the NAS Complaints speak for themselves and deny any allegations inconsistent therewith.**

33.    The NAS Complaints contend that the guardians have, because of the NAS Children's' [sic] addiction to opioids allegedly resulting from defendants' wrongful conduct, suffered damages in the form of the costs of on-going medical, psychiatric and psychological care, physical, cognitive and speech therapy, and medical testing and monitoring. *See* **Exhibit 9** (*Artz* at ¶¶ 444-48); **Exhibit 10** (*Frost* at ¶¶ 440-444).

**RESPONSE: AGLIC and XL admit the NAS Complaints seek certain relief related to the "on-going care for the . . . conditions which are known to result from in utero exposure to opioids." AGLIC and XL state that the NAS Complaints speak for themselves and deny any allegations inconsistent therewith.**

34.    The NAS plaintiffs further allege that "they must continue to carry the substantial burdens and obligations or care for the NAS Children, as neonatal exposure to opioids necessarily results in medical needs that exist throughout the entire period of the NAS Children's adolescent development." *See* **Exhibit 9** (*Artz* at ¶ 10); **Exhibit 10** (*Frost* at ¶ 10).

**<u>RESPONSE</u>: AGLIC and XL admit that Paragraph 34 quotes certain language from the NAS Complaints. AGLIC and XL further state that the NAS Complaints speak for themselves and deny any allegations inconsistent therewith.**

35.     The NAS Plaintiffs contend that the NAS Children have "injuries fairly traceable to each Defendant [including Giant Eagle] whose acts and/or omissions released a veritable torrent of highly-addictive and destructive opiates and opioids into the State of Ohio and into the birth mothers' bodies where they targeted the helpless infants . . ." *See* **Exhibit 9** (*Artz* at ¶ 10); **Exhibit 10** (*Frost* at ¶ 10).

**<u>RESPONSE</u>: AGLIC and XL admit that Paragraph 35 quotes certain modified language from the NAS Complaints. AGLIC and XL further state that the NAS Complaints speak for themselves and deny any allegations inconsistent therewith.**

36.     The *Cuyahoga* and *Summit* Actions assert claims on behalf of the Ohio counties seeking damages because of bodily injuries allegedly suffered by their citizens and were the first two cases set fort [sic] trial in the Opioid MDL. *See, e.g.,* **Exhibit 5** (*Cuyahoga* at ¶¶ 1, 27-35); **Exhibit 7** (*Summit* at ¶¶ 1, 28-40); Ross Decl. ¶ 4.

**<u>RESPONSE</u>: AGLIC and XL admit that the *Cuyahoga* and *Summit* Actions (the "County Complaints") assert claims on behalf of the Ohio counties and that they were the first two opioid MDL cases scheduled for a "Track One" bellwether trial. AGLIC and XL deny that the County Complaints seek damages because of bodily injuries allegedly suffered by their citizens as they disclaim any attempt to seek such damages. Instead, each of the County Complaints expressly allege that "Plaintiff does not seek damages for death, physical injury to person, emotional distress, or physical damages to property, as defined under the Ohio Product Liability Act." (Doc. 77-7, at ¶ 159; Doc. 77-9, at ¶ 144). AGLIC**

and XL further state that the County Complaints speak for themselves and deny any allegations inconsistent therewith.

37.     The County Complaints allege a variety of physical harms caused by opioid addiction, including "a dramatic increase in opioid abuse, addiction, overdose, and death throughout the United States," *see* **Exhibit 5** (*Cuyahoga* at ¶ 661), as well as increases in emergency room visits and treatment, Hepatitis C, and infants born with NAS. *Id.* at ¶¶ 679, 681, 689; *see also* **Exhibit 7** (*Summit* at ¶¶ 18, 729, 733-34, 742-44).

**RESPONSE: AGLIC and XL admit that Paragraph 37 quotes certain language from the County Complaints. AGLIC and XL deny that the County Complaints seek damages because of bodily injuries allegedly suffered by their citizens as they disclaim any attempt to seek such damages. Instead, the County Complaints expressly allege: "Plaintiff does not seek damages for death, physical injury to person, emotional distress, or physical damages to property, as defined under the Ohio Product Liability Act." (Doc. 77-7 at ¶ 159; Doc. 77-9 at ¶ 144). AGLIC and XL further state that the County Complaints speak for themselves and deny any allegations inconsistent therewith.**

38.     The County Complaints contend that Plaintiffs have "suffered significant and ongoing harms" by reason of the failure by defendants, including Giant Eagle, to effectively control the distribution of prescription opioids. *See, e.g.* **Exhibit 5** (*Cuyahoga* at ¶¶ 710, 729).

**RESPONSE: AGLIC and XL admit that Paragraph 37 quotes certain language from the County Complaints. AGLIC and XL further state that the County Complaints speak for themselves and deny any allegations inconsistent therewith.**

39.     The County Complaints seek as damages the incremental and allegedly enormous sums spent on emergency medical treatment, detoxification and addiction treatment, and recovery services, among other things. *See* **Exhibit 5** (*Cuyahoga* at ¶¶ 730-50); **Exhibit 7** (*Summit* at ¶ 20).

**RESPONSE**: **AGLIC and XL admit that the County Complaints seek various forms of relief. AGLIC and XL state that the County Complaints speak for themselves and deny any allegations inconsistent therewith.**

40.     The County Plaintiffs contend they "allocate[] substantial portions of [their] budgets to prevent, treat, and assist in recovery from opioid addiction," and "[b]ut for Defendants' conduct, [they] would not have spent the massive amounts [they have] and will continue to spend in the future." *See* **Exhibit 5 (***Cuyahoga* at ¶ 751).

**RESPONSE**: **AGLIC and XL admit that Paragraph 40 quotes certain modified language from the County Complaints. AGLIC and XL further state that the County Complaints speak for themselves and deny any allegations inconsistent therewith.**

41.     The Opioid Complaints allege bodily injury occurring 1999 to present. *See, e.g.*, **Exhibit 5 (***Cuyahoga* at ¶¶ 5 (alleging hundreds of thousands of opioid-related overdose deaths between 1999 and 2016), 706 (increase in babies born addicted to opioids between 2010 and 2017), 739 (recounting number of doses of naloxone administered for opioid overdose in 2005, 2016 and 2017)); **Exhibit 10 (***Frost* at ¶¶ 8, 397 (defining putative class as persons born after May 9, 2000 and medically diagnosed with NAS)); **Exhibit 9 (***Artz* at ¶ 8 (same, with date of March 16, 2000)).

**RESPONSE**: **AGLIC and XL admit that certain of the Opioid Complaints contain allegations of wrongful conduct by the defendants spanning from 1999 to the present. AGLIC and XL admit that the NAS Complaints allege bodily injury. AGLIC and XL deny that the County Complaints seek damages because of bodily injuries allegedly suffered by their citizens as they disclaim any attempt to seek such damages. Instead, the County Complaints expressly allege: "Plaintiff does not seek damages for death, physical injury to person, emotional distress, or physical damages to property, as defined under the Ohio Product Liability Act." (Doc. 77-7 at ¶ 159; Doc. 77-9 at ¶ 144). AGLIC and XL further**

state that the Opioid Complaints speak for themselves and deny any allegations

inconsistent therewith.

42.    Plaintiffs in *Artz* allege that Giant Eagle failed to report suspicious orders when it "knew or should have known" that opioids were being diverted to unauthorized users or dispensed based on suspicious prescriptions. *See* **Exhibit 9** (*Artz* at ¶¶ 319-20; 342, 347).

**RESPONSE**: AGLIC and XL admit that Paragraph 42 quotes certain language

from the *Artz* complaint. AGLIC and XL state that the *Artz* complaint speaks for itself and

deny any allegations inconsistent therewith.

43.    Plaintiffs in *Cuyahoga* allege that Giant Eagle failed to maintain effective controls to prevent diversion, or to investigate and report, or take steps to halt opioid orders "that they knew or should have known were suspicious." *See* **Exhibit 5** (*Cuyahoga* at ¶ 480; *see also* ¶¶ 504, 652).

**RESPONSE**: AGLIC and XL admit that Paragraph 43 quotes certain language

from the *Cuyahoga* complaint. AGLIC and XL state that the *Cuyahoga* complaint speaks

for itself and deny any allegations inconsistent therewith.

44.    The *Cuyahoga* action alleges that all distributor and pharmacy defendants in the supply chain, including Giant Eagle, "failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified, thereby contributing to the oversupply of such drugs and fueling an illegal secondary market." **Exhibit 5** (*Cuyahoga* at ¶ 9). The *Cuyahoga* Complaint, as well as the other Opioid Complaints, repeatedly reallege this theme. *See id* at ¶¶ 14, 95, 480-81, 485-86, 488-91, 494, 496, 502, 548, 561, 569, 587-88, 597-601, 648-49; **Exhibit 7** (*Summit* at ¶¶ 1, 9, 14, 101, 493-94, 501-02, 504-07, 510, 512, 518, 566, 580, 612-13, 622-26, 685-86; **Exhibit 9** (*Artz* at ¶¶ 4, 285-87, 289, 293-94, 313-16, 320-22, 327-28, 337-41, 350); **Exhibit 10** (*Frost* at ¶ 350 (asserting that the Pharmacy Defendants' "actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have contributed significantly to the opioid crisis by enabling, and failing to prevent, the diversion of opioids"), 5, 285-87, 289).

**RESPONSE**: AGLIC and XL admit that Paragraph 43 quotes certain language

from the *Cuyahoga* complaint. AGLIC and XL admit that the other Opioid Complaints

contain similar allegations against Giant Eagle. AGLIC and XL state that the Opioid

Complaints speak for themselves and deny any allegations inconsistent therewith.

45.     The Opioid Complaints each point to Giant Eagle's failure to maintain effective
controls to prevent the diversion of prescription opioids in support of certain of the legal theories
of recovery plead in the actions. *See, e.g.,* **Exhibit 5** (*Cuyahoga* at ¶¶ 1027 (statutory public
nuisance), 1053 (common law absolute public nuisance); **Exhibit 7** (*Summit* at ¶¶ 986 (statutory
public nuisance), 1012 (common law absolute public nuisance); **Exhibit 9** (*Artz* at ¶¶ 419-20,
429 (negligence), 432-33 (negligence *per se*); **Exhibit 10** (*Frost* 419-20, and 429 (negligence),
432-33 (negligence *per se*), 436 (civil battery)).

**RESPONSE:** **AGLIC and XL admit that the Opioid Complaints allege certain**

**causes of action based on, among other things, Giant Eagle's failure to maintain effective**

**controls to prevent diversion of opioids. AGLIC and XL state that the Opioid Complaints**

**speak for themselves and deny any allegations inconsistent therewith.**

46.     The Opioid Complaints assert negligence and negligence-based nuisance causes
of action. *See* **Exhibit 5** (*Cuyahoga*, fifth and sixth claims for relief); **Exhibit 7** (*Summit*, fifth
and sixth claims for relief); **Exhibit 9** (*Artz*, third and fourth causes of action); **Exhibit 10** (*Frost*,
third and fourth causes of action);

**RESPONSE:** **AGLIC and XL admit that the Opioid Complaints include negligence**

**and/or nuisance causes of action, but deny that such causes of action in the Opioid**

**Complaints are actually based on factual allegations of negligence. AGLIC and XL state**

**that the only counts remaining in the County Complaints no longer include "negligence"**

**but rather claims for: (1) violation of RICO; (2) violation of the Ohio Corrupt Practices**

**Act; (3) public nuisance; and (4) conspiracy ─ all of which necessarily require proof of or**

**are otherwise based on intentional conduct.** ***See* Plaintiffs' Notice of Dismissal of Certain**

**Causes of Action, Case 1:17-md-02804-DAP (N.D. Ohio), Doc. 2487 (August 19, 2019).**

47.     Giant Eagle has spent at least $5.7 million defending against the Opioid Lawsuits.
*See* Ross Decl. at ¶¶ 9-11 and Exh. E.

**RESPONSE**: **AGLIC and XL lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47.**

48.     Neither AGLIC nor Zurich has reimbursed Giant Eagle for any of its defense costs incurred in connection with the Opioid Complaints or otherwise agreed to defend Giant Eagle in connection with the same. *See* First Am. Compl. for Declaratory Judgment and Damages, ¶ 78.

**RESPONSE**: **Admitted by AGLIC. XL lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and disputes that the allegations in Paragraph 48 are material to Giant Eagle's Motion as it concerns XL.**

49.     Giant Eagle and Old Republic separately entered into a Program Agreement that defines "Allocated Loss Adjustment Expenses" to include attorneys' fees. *See* **Exhibit 11** (Program Agreement, Section 4(a).

**RESPONSE**: **AGLIC and XL admit only that Giant Eagle attached to its Appendix, as Exhibit 11, a Program Agreement entered into between Old Republic and Giant Eagle, which Giant Eagle purports is a "true and correct copy." (Doc. 77-13 at ¶ 14). AGLIC and XL admit that Section 4(a) of the Program Agreement purports to set forth a definition of "Allocated Loss Adjustment Expenses" that includes attorneys' fees. AGLIC and XL state that the Program Agreement speaks for itself and deny any allegations inconsistent therewith.**

50.     The Program Agreement provides: "[t]o the extent that any terms or conditions of the aforesaid Policies are inconsistent with any of the terms or conditions of this Agreement, the latter are to be given effect and the former will be considered superseded by this Agreement. *See* **Exhibit 11** (Program Agreement, Section 20).

**RESPONSE**: **AGLIC and XL admit that Paragraph 50 quotes certain modified language from Section 20 of the Program Agreement. AGLIC and XL state that the Program Agreement speaks for itself and deny any allegations inconsistent therewith.**

AGLIC and XL deny that the terms of the Old Republic Policies are inconsistent with the Program Agreement insofar as they both provide for defense expenses to be paid outside the limits of the Old Republic Policies. (Doc. 77-4 at pp. 19, 21; Doc. 77-5 at pp. 16, 18.)

**AGLIC AND XL'S JOINT RESPONSE TO GIANT EAGLE'S SUPPLEMENTAL**
**CONCISE STATEMENT OF MATERIAL FACTS**

Pursuant to LCvR 56.B.1, AGLIC and XL hereby respond to Plaintiff/Counterdefendants

Giant Eagle's Supplemental Concise Statement of Material Facts (Doc. 86) as follows:

1.      Giant Eagle has been named as a defendant in multiple lawsuits by plaintiffs
seeking to recover damages for alleged harm from Giant Eagle's distribution of prescription
opioids, including *City of Cleveland, Ohio, et al. v. Purdue Pharma L.P., et al.*, No. 18-OP-
45132 (M.D. Ohio) (the "*Cleveland* Action"); *City of Barberton, et al. v. Purdue Pharma L.P., et
al.*, No. 1:18-op-45767-DAP (N.D. Ohio) (the "*Barberton* Action"); *Mental Health & Recovery
Services Board of Allen, Auglaize, and Hardin Counties v. Purdue Pharma L.P., et al.*, No. 1:18-
op-46344-DAP (N.D. Ohio) (the "*Mental Health & Recovery Services* Action"); *Geauga County
Board of County Commissioners v. Purdue Pharma LP., et al.*, No. 1:18-op-45256-DAP (N.D.
Ohio) (the "*Geauga* Action"); *Columbiana County Board of County Commissioners v. Purdue
Pharma L.P., et al.*, No. 1:18-op-45289-DAP (N.D. Ohio) (the "*Columbiana* Action"); *County of
Trumbull v. Purdue Pharma L.P., et al.*, No. 1:18-op-45079-DAP (N.D. Ohio) (the "*Trumbull*
Action"); *County of Lake v. Purdue Pharma L.P., et al.*, No. 1:18-op-45032-DAP (N.D. Ohio)
(the "*Lake* Action"); *City of Warren v. Purdue Pharma L.P., et al.*, No. 1:18-op-45434-DAP
(N.D. Ohio) (the "*Warren* Action"); *City of Saratoga Springs v. Purdue Pharma, et al.*, No.
1:19-cv-00789 (N.D.N.Y) (the "*Saratoga Springs* Action"); *City of Ogdensburg v. Purdue
Pharma, et al.*, No. 8:19-cv-00782-DNH-DJS (N.D.N.Y.) (the "*Ogdensburg* Action"); *County of
Kaua'i v. Purdue Pharma et al.*, No. 1:19-cv-00377-LEK-KJM (D. Haw.) (the "*Kaua'i* Action");
*City of Rochester v. Purdue Pharma L.P., et al.*, No. 6:19-cv-06490-FPG (W.D.N.Y.) (the
"*Rochester* Action"); *City of Auburn v. Purdue Pharma L.P., et al.*, No. 2:19-cv-03800-JMA-SIL
(E.D.N.Y.) (the "*Auburn* Action"); and *City of Poughkeepsie v. Purdue Pharma L.P., et al.*, No.
7:19-cv-06800-KMK (S.D.N.Y.) (the "*Poughkeepsie* Action"). See **Exhibit 12** (*Cleveland*
complaint), **Exhibit 13** (*Barberton* complaint), **Exhibit 14** (*Mental health & Recovery Services*
complaint), **Exhibits 15** and **16** (*Geauga* complaint), **Exhibits 17** and **18** (*Columbiana*
complaint), **Exhibits 19** and **20** (*Trumbull* complaint), **Exhibits 21** and **22** (*Lake* complaint),
**Exhibits 23** and **24** (*Warren* complaint), **Exhibit 25** (*Saratoga Springs* complaint), **Exhibit 26**
(*Ogdensburg* complaint), **Exhibit 27** (*Kaua'i* complaint), **Exhibit 28** (*Rochester* complaint),
**Exhibit 29** (*Auburn* complaint), and **Exhibit 30** (*Poughkeepsie* complaint) to the Suppl.
Appendix.

**RESPONSE: AGLIC and XL admit that Giant Eagle, Inc. and/or HBC Service**

**Company are named as defendants in the various lawsuits listed in Paragraph 1. AGLIC**

**and XL dispute that each of these complaints seeks relief only for alleged harm from Giant**

**Eagle's distribution of prescription opioids, as the complaints also include allegations**

**against Giant Eagle as an opioid dispenser and concern Giant Eagle operations at disparate**

**locations in several states.** *See* **Doc. 86-2 at ¶¶ 91, 95; Doc. 86-3 at ¶¶ 110, 124; Doc. 86-4 at**

¶¶ 91, 95; Doc. 86-6 at ¶ 1.1.1; Doc. 86-8 at ¶ 1.1.1; Doc. 86-10 at ¶¶ 54-55; Doc. 86-12 at ¶¶ 56-57; Doc. 86-14 at ¶¶ 56-57; Doc. 86-15 at ¶¶ 206-07; Doc. 86-16 at ¶¶ 206-07; Doc. 86-17 at ¶¶ 192-93; Doc. 86-18 at ¶¶ 206-07; Doc. 86-19 at ¶¶ 206-07; Doc. 86-20 at ¶¶ 191-92. AGLIC and XL further dispute that the allegations in Paragraph 1 are material to Giant Eagle's Motion.

2.      The *Cleveland* complaint, *Barberton* complaint, *Mental Health & Recovery Services* complaint, *Geauga* complaint, *Columbiana* complaint, *Trumbull* complaint, *Lake* complaint, *Warren* complaint, *Saratoga Springs* complaint, *Ogdensburg* complaint, *Kaua'i* complaint, *Rochester* complaint, *Auburn* complaint and *Poughkeepsie* complaint each allege factual allegations materially similar to those set forth in the County Complaints.

**RESPONSE: AGLIC and XL lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 as Giant Eagle fails to provide any specificity as to the allegations from the various lawsuits that it claims are "materially similar" to those in the "County Complaints."  AGLIC and XL further dispute that the allegations in Paragraph 2 are material to Giant Eagle's Motion.**

## AGLIC AND XL'S CONCISE STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to LCvR 56.B.1, Defendants/Counterclaimants AGLIC and XL submit this
Concise Statement of Additional Material Facts in support of their concurrently filed Response
in Opposition to Plaintiffs' Motion for Partial Summary Judgment on the Duty to Defend. This
Concise Statement of Additional Material Facts is supported by the Declarations of June Dell
and W. Joel Vander Vliet, filed contemporaneously herewith, the Exhibits attached to the
Appendix of Exhibits Cited in Support of AGLIC and XL's Response in Opposition to Plaintiffs'
Motion for Partial Summary Judgment on the Duty to Defend (the "Appendix"), and the
pleadings and other filings of record in this matter.

1.      Giant Eagle, Inc. and/or HBC Service Company (collectively, "Giant Eagle") has
been named as a defendant in multiple opioid-related lawsuits, including *County of Cuyahoga,
Ohio v. Purdue Pharma L.P., et al.*, Case No 17-OP-45004 (N.D. Ohio) (the "*Cuyahoga*
Action"); *County of Summit, Ohio v. Purdue Pharma L.P., et al.*, Case No 18-OP-45090 (N.D.
Ohio) (the "*Summit* Action"); *Artz, et al. v. Endo Health Solutions, Inc., et al.*, Case No 19-op-
45459 (N.D. Ohio) (the "*Artz* Action"); and *Frost, et. al. v. Endo Health Solutions, Inc., et al.*,
Case No 18-op-46327 (N.D. Ohio) (the "*Frost* Action"). Giant Eagle references the *Cuyahoga*,
*Summit*, *Artz*, and *Frost* actions throughout its Memorandum of Law in Support of Motion for
Partial Summary Judgment as the "Opioid Complaints" (Doc. 76 at p. 2 n. 1.) and, as such, they
are referred to herein as the "Opioid Complaints."

2.      Giant Eagle has also been named as a defendant in other opioid-related lawsuits in
addition to the Opioid Complaints, including those identified in Giant Eagle's First Amended
Complaint (Doc. 46 at pp. 5-7, ¶¶ 21-22.). All of the opioid-related lawsuits against Giant Eagle
are referred to herein as the "Opioid Lawsuits."

3.      Old Republic Insurance Company ("Old Republic") issued a series of insurance
policies to Giant Eagle, including Policy No. MWZY 304638 for the period of April 1, 2015 to
April 1, 2016 (the "2016 Old Republic Policy") and Policy No. MWZY 307316 for the period of
April 1, 2016 to April 1, 2017 (the "2017 Old Republic Policy") (collectively, the "Old Republic
Policies"). (Doc. 46 at pp. 12-13, ¶ 44, and pp. 16-17, ¶ 61.)

4.      In exchange for a premium (Doc. 77-4 at p. 5; Doc. 77-5 at p. 4), Old Republic
agreed, in the Old Republic Policies, to provide Giant Eagle with general liability coverage for
"those sums" that Giant Eagle "becomes legally obligated to pay as damages because of 'bodily

injury' or 'property damage' … caused by an 'occurrence.'" (Doc. 77-4 at pp. 29, 43; Doc. 77-5 at pp. 26, 40.)

5.      In the Old Republic Policies, Old Republic assumed a duty to defend Giant Eagle against "any 'suits' seeking these damages," although Old Republic has no obligation to defend any "suit" alleging "bodily injury" or "property damage" that is not covered under an Old Republic policy. The Old Republic Policies state "No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**." (Doc. 77-4 at p. 29; Doc. 77-5 at p. 26.)

6.      Old Republic and Giant Eagle agreed to a Self Insured Retention Endorsement (the "SIR Endorsement") in each of the Old Republic Policies through which Giant Eagle agreed to a $1 million self-insured retention ("SIR") per "occurrence." (Doc. 77-4 at pp. 21-23; Doc. 77-5 at pp. 18-20.)

7.      Old Republic's duties and obligations under the Old Republic Policies are not implicated until the SIR has been satisfied, pursuant to the SIR Endorsement, for each policy and with respect to each occurrence. The SIR Endorsement provides that "[r]egardless of the Other Insurance provisions in this policy, this insurance is excess over the 'self insured retention'." (Doc. 77-4 at pp. 21-23; Doc. 77-5 at pp. 18-20.)

8.      Paragraph A of the SIR Endorsement states that Old Republic's obligations "to pay ***damages*** on [Giant Eagle's] behalf apply in excess of the 'self insured retention.'" (Doc. 77-4 at p. 21, ¶ A; Doc. 77-5 at p. 18, ¶ A (emphasis added).)

9.      The use of the term "damages" in Paragraph A of the SIR Endorsement relates to the insuring agreement and pertains only to claims for indemnity — settlement or judgments — and not defense costs. (Doc. 77-4 at pp. 21, 29; Doc. 77-5 at pp. 18, 26.)

10.     The Old Republic Policies define "Self insured retention" to mean "the amount the insured legally must pay with respect to claims or "suits." Further, the Old Republic Policies state "[t]he 'self insured retention' will not be satisfied by payment of any claim or 'suit' brought against the insured that would not be covered under the terms of the policy." (Docs. 77-4 at p. 23; 77-5 at p. 20.)

11.     Paragraph C of the SIR Endorsement expressly states that Supplementary Payments, which include Allocated Loss Adjustment Expenses ("ALAE"), do not satisfy the $1 million per occurrence SIR. (Doc. 77-4 at p. 22, ¶ C; Doc. 77-5 at p. 19, ¶ C.)

12.     The Old Republic Policies describe "Supplementary Payments" as:

[W]ith respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a.  All expenses we incur.

b.  Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c.  The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d.  All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e.  All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f.  Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g.  All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

(Doc. 77-4 at pp. 36-37; Doc. 77-5 at pp. 33-34.)

13.  Paragraph C of the SIR Endorsement provides that if ALAE are not described in the Old Republic Policies — which they are not — then they are defined to include defense costs. (Doc. 77-4 at p. 22, ¶ C; Doc. 77-5 at p. 19, ¶ C.)

14.  Giant Eagle's ALAE, including defense costs, do not erode or satisfy the SIR under the Old Republic Policies. (Doc. 77-4 at p. 22, ¶ C; Doc. 77-5 at p. 19, ¶ C; Ex. 19 to Appendix at p. 9, ¶ 9; Docs. 41 & 70, at ¶¶ 16; Docs. 43 & 71 at ¶¶ 17.)

15.     Paragraph G of the SIR Endorsement states that Old Republic has no duty to defend suits within the $1 million per occurrence SIR, and Giant Eagle "must" do so "at its own expense." (Doc. 77-4 at p. 22, ¶ G; Doc. 77-5 at p. 19, ¶ G.)

16.     The Old Republic Policies do not require Old Republic to provide a defense to Giant Eagle unless and until all SIRs have been satisfied. (Ex. 19 to Appendix at p. 11, ¶ 13).

17.     None of the Old Republic Policies' SIRs have been satisfied in connection with the Opioid Complaints. (Ex. 19 to Appendix at pp. 6-7, ¶ 1.)

18.     Once Giant Eagle has satisfied its SIRs under the Old Republic Policies, Old Republic's duty to defend remains in place until Old Republic has "used up the applicable limit of insurance in the payment of judgments or settlements." (Docs. 77-4 at p. 29; 77-5 at p. 26.)

19.     Giant Eagle and Old Republic agreed to a Scheduled Deductible Coverage Endorsement (the "Deductible Endorsement") in each of the Old Republic Policies. (Doc. 77-4 at pp. 19-20; Doc. 77-5 at pp. 16-17.)

20.     The Deductible Endorsement is implicated only after Giant Eagle satisfies its obligations under the SIR Endorsement. (Doc. 77-4 at p. 21, ¶ A; Doc. 77-5 at p. 18, ¶ A.)

21.     The deductible is equal to the limits of the Old Republic policy — $1 million per occurrence — *plus* all ALAE/supplementary payments. The deductible must be satisfied by damages that are in fact "payable" under the Old Republic Policies. (Doc. 77-4 at p. 19; Doc. 77-5 at p. 16.)

22.     Paragraph B of the Deductible Endorsement expressly states that Supplementary Payments, which include ALAE, do not satisfy the $1 million per occurrence deductible. (Doc. 77-4 at p. 20, ¶ B; Doc. 77-5 at p. 17, ¶ B.)

23.     Paragraph B of the Deductible Endorsement provides that if ALAE are not described in the Old Republic Policies — which they are not — then then they are defined to include defense costs. (*Id.*)

24.     Under the Old Republic Policies, "Supplementary Payments" include "[a]ll expenses [Old Republic] incur[s]" in discharging its duty to defend. (Doc. 77-4 at p. 36; Doc. 77-5 at p. 33.)

25.     Giant Eagle's ALAE, including defense costs, do not erode or satisfy the deductible under any of the Old Republic Policies. (Doc. 77-4 at p. 20, ¶ B; Doc. 77-5 at p. 17, ¶ B; Ex. 19 to Appendix at pp. 9-10, ¶ 10; Docs. 41 & 70 at ¶¶ 17.)

26.    None of the Old Republic Policies' deductibles have been satisfied in connection with the Opioid Complaints. (Ex. 19 to Appendix at p. 7, ¶ 2.)

27.    Giant Eagle's ALAE, including defense costs, do not erode or satisfy the limits of liability under any of the Old Republic Policies. (Ex. 19 to Appendix at pp. 10-11, ¶ 11.)

28.    Old Republic has not paid any defense costs to or on behalf of Giant Eagle with respect to any Opioid Complaint. (Ex. 19 to Appendix at p. 8, ¶ 7.)

29.    Old Republic has not paid any judgment or settlement to or on behalf of Giant Eagle with respect to any Opioid Complaint. (Ex. 19 to Appendix at p. 8, ¶ 8.)

30.    None of the Old Republic Policies' limits of liability have been satisfied in connection with the Opioid Complaints. (Ex. 19 to Appendix at p. 7, ¶ 3.)

31.    The Program Agreement between Giant Eagle and Old Republic expressly defines "'Allocated Loss Adjustment Expenses' to include attorneys' fees." (Doc. 77-12 at p. 3, ¶ 4(a).)

32.    Under the Program Agreement between Giant Eagle and Old Republic, "ALAE is in addition to Policy Limits. ALAE is retained by the Insured in addition to the Insured's Retention for Loss. The Insured is responsible for all ALAE and all Loss under the Policy." (Doc. 77-12 at pp. 34, 37.)

33.    Prior to bringing the instant action, on May 28, 2019, Giant Eagle filed a similar lawsuit against AGLIC and XL, but naming Old Republic as well, seeking coverage in connection with opioid-related claims asserted against it (the "Ohio Coverage Lawsuit"). (Ex. 16 to Appendix.)

34.    In the Ohio Coverage Lawsuit, Giant Eagle alleged:

- Old Republic's duty to defend terminates only after the Policy's Limits of Insurance have been used up in the payment of judgments and settlements because of "bodily injury." (Ex. 16 to Appendix at ¶ 58.)

- "Loss" [as defined in the AGLIC policy] means "those sums actually paid that [Giant Eagle] is legally obligated to pay as damages or the settlement or satisfaction of a claim because of injury of offense." Section V.A.3. "Loss," however, does not include defense expenses. (*Id.* at ¶ 67.)

- On February 15, 2019, Old Republic responded to the letter from Giant Eagle's outside counsel with an email to Giant Eagle's in-house insurance analyst. The entirety of Old Republic's substantive response was as follows:

> As you are aware coverage is provided to Giant Eagle by Old Republic Insurance on a Limits equals Matching deductible basis, and all ALAE costs are outside of the deductible and the limit. In essence it is all Giant Eagles [sic] money. It was our understanding that Giant Eagle has been handling and continues to handle the defense of this matter pursuant to applicable policy deductibles.

(*Id.* at ¶ 94.)

- With respect to defense, the Old Republic Policies provide that Old Republic has "the right and duty to defend [Giant Eagle] against any 'suit' seeking [bodily injury] damage," and that the duty to defend ends only when Old Republic has "used up the applicable limit of insurance in the payment of judgments or settlements." (*Id*. at ¶ 97.)

- Old Republic's "obligation to pay ***damages***" is subject to the deductible, but there is no such limitation on Old Republic's duty to defend. (*Id.* at ¶ 98; emphasis in original.)

35.    Giant Eagle voluntarily dismissed the Ohio Coverage Lawsuit without prejudice on June 26, 2019. (Ex. 17 to Appendix.)

36.    Old Republic has admitted in this action that Giant Eagle's ALAE, including defense costs, do not erode or satisfy the SIR under the Old Republic Policies. (Ex. 19 to Appendix at p. 9, ¶ 9; Docs. 41 & 70, at ¶ 16; Docs. 43 & 71 at ¶ 17.)

37.    Old Republic has admitted in this action that the Old Republic Policies do not require Old Republic to provide a defense to Giant Eagle for any of the Opioid Complaints unless and until all SIRs have been satisfied. (Ex. 19 to Appendix at p. 11, ¶ 13.)

38.    Old Republic has admitted in this action that none of the Old Republic Policies' SIRs have been satisfied in connection with the Opioid Complaints. (Ex. 19 to Appendix at pp. 6-7, ¶ 1.)

39.    Old Republic has admitted in this action that Giant Eagle's ALAE, including defense costs, do not erode or satisfy the deductible under any of the Old Republic Policies. (Ex. 19 to Appendix at pp. 9-10, ¶ 10; Docs. 41 & 70, at ¶¶ 17.)

40.    Old Republic has admitted in this action that none of the Old Republic Policies' deductibles have been satisfied in connection with the Opioid Complaints. (Ex. 19 to Appendix at p. 7, ¶ 2.)

41.     Old Republic has admitted in this action that Giant Eagle's ALAE, including defense costs, do not erode or satisfy the limits of liability under any of the Old Republic Policies. (Ex. 19 to Appendix at p. 10-11, ¶ 11.)

42.     Old Republic has admitted in this action that Old Republic has not paid any defense costs to or on behalf of Giant Eagle with respect to any Opioid Complaint. (Ex. 19 to Appendix at p. 8, ¶ 7.)

43.     Old Republic has admitted in this action that Old Republic has not paid any judgment or settlement to or on behalf of Giant Eagle with respect to any Opioid Complaint. (Ex. 19 to Appendix at p. 8, ¶ 8.)

44.     Old Republic has admitted in this action that none of the Old Republic Policies' limits of liability have been satisfied in connection with the Opioid Complaints. (Ex. 19 to Appendix at p. 7, ¶ 3.)

45.     Coverage A of the AGLIC Policy provides, in part:

Under **Coverage A,** we will pay on behalf of the **insured** those damages covered by this insurance in excess of the total applicable limits of **underlying insurance.** With respect to **Coverage A,** this policy includes:

1.     The terms and conditions of **underlying insurance** to the extent such terms and conditions are not inconsistent or do not conflict with the terms and conditions referred to in Paragraph **2.** below;

2.     The terms and conditions that apply to **Coverage A** of this policy.

Notwithstanding anything to the contrary contained above, if **underlying insurance** does not apply to damages, for reasons other than exhaustion of applicable Limits of Insurance by payment of **loss**, then **Coverage A** does not apply to such damages.

(Doc 77-2 at p. 13.)

46.     Section III of the AGLIC Policy, entitled "DEFENSE AND SUPPLEMENTARY PAYMENTS," provides, in part:

**A.**     We have the right and duty to assume control of the investigation and settlement of any claim, or defense of any **suit** against the **insured** for damages covered by this policy:

1. Under **Coverage A,** when the applicable limit of **underlying insurance** and **other insurance** has been exhausted by payment of **loss** for which coverage is afforded under this policy . . . .

(Doc. 77-2 at p. 15.)

47. The AGLIC Policy defines "Loss" as "those sums actually paid that [Giant Eagle] is legally obligated to pay as damages for the settlement or satisfaction of a claim." "Loss" does not include defense expenses if the underlying Old Republic Policy does not include them in the limits of insurance. (Doc. 77-2 at p. 22, § V.A.3.)

48. The AGLIC Policy defines "Other Insurance" as "a policy of insurance providing coverage that this policy also provides. **Other insurance** includes any type of self-insurance or other mechanism by which an **insured** arranges for funding of legal liability." (Doc. 77-2 at p. 22, § V.A.4.)

49. The AGLIC Policy defines "Underlying Insurance" as "the policy or policies of insurance listed in the Schedule of Underlying Insurance forming a part of this policy." (Doc. 77-2 at p. 22, § V.A.7.)

50. The Schedule of Underling Insurance identifies the 2016 Old Republic Policy. (Doc. 77-2 at p. 8.)

51. The AGLIC Policy provides that "**Coverage A** applies only in excess of the greater of the actual Limits of Insurance or **underlying insurance** or the Limits of Insurance shown on the Schedule of Underlying Insurance forming a part of this policy." (Doc. 77-2 at p. 14, § II.C.)

52. In Section VI.A.11. of the AGLIC Policy, entitled "Maintenance of Underlying Insurance," Giant Eagle agreed "[t]hat the Limits of the Insurance of the policies listed in the Schedule of Underlying Insurance will be maintained except for any reduction or exhaustion of limits by payment of claims or **suits** for damages covered by **underlying insurance** . . . ." (Doc. 77-2 at p. 29.)

53. Giant Eagle's insurance submission for the AGLIC Policy indicates that a "coverage extension" for Giant Eagle's "umbrella insurance" was "First Dollar Defense coverage – in addition to liability limits" and states "Loss adjustment expenses do not erode retention." (Vander Vliet Declar. at ¶ 4; Ex. 14 to Appendix at pp. 21, 33.)

54. The AGLIC Policy was the last in a series of policies issued by AGLIC to Giant Eagle excess of Old Republic policies, dating back to the 2009-2010 policy year. (Doc. 46 at pp. 11-13, ¶¶ 40, 44.) AGLIC's quotation for the 2009 policy year, and others, stated, under the

heading "underlying insurance minimum requirements": "Defense: Outside Limits" and "Note: GL limits are excess of $1,000,000 Each and every SIR excluding ALAE." (Ex. 13 to Appendix at pp. 2, 6, 10.)

55.     In an email dated September 25, 2018 Lisa E. Chonarzewski of AGLIC asked Sarah Nelson of Giant Eagle, among other requests for information, "whether the defense costs erode the subject SIR(s)." (Ex. 15 to Appendix.)

56.     Scott D. Livingston, Giant Eagle's counsel of record in this case, the Ohio Coverage Lawsuit, and the underlying Opioid Lawsuits, confirmed in September 2018 that "defense costs do not erode the subject SIRs" under the Old Republic Policies. (Ex. 15 to Appendix)

57.     Under Insuring Agreement A - Excess Follow Form Liability in the XL Policy, XL is required to pay on behalf of Giant Eagle:

> . . . subject to Section IV. Limits of Insurance, those amounts [Giant Eagle] becomes legally obligated to pay as damages in excess of the "scheduled underlying insurance" as a result of a "claim" covered by the "scheduled underlying insurance" and this policy, but only if the actual payment of "loss" to which this policy applies, by you or insurers providing "scheduled underlying insurance" exceeds the limits of the "scheduled underlying insurance" and any applicable and collectible "other insurance."

(Doc. 77-3 at p. 47.)

58.     The XL Policy provides that "[XL] will pay only that amount of 'loss' that is in excess of the 'retained limit.'" (Doc. 77-3 at p. 23, ¶ IV.(B).)

59.     The XL Policy provides that:

> [XL] will have the right and duty to defend any "suit" covered by Insuring Agreement A, but only if the actual payment of "loss" to which this policy applies, by you or insurers providing "scheduled underlying insurance" exceeds the limits of the "scheduled underlying insurance" and any applicable and collectible "other insurance."

(Doc. 77-3 at p. 47, ¶ III.(A).)

60.     As defined in the XL Policy, "Loss":

[M]eans those sums you become legally obligated to pay as settlements or judgments in connection with a **_covered_** "claim." "Loss" shall include expenses incurred to investigate a "claim" or defend a "suit" if so provided in the "scheduled underlying insurance."

(Doc. 77-3, at p. 34 (emphasis added).)

61.     As defined in the XL Policy, "other insurance" means:

a policy of insurance providing coverage for damages to which this insurance also applies.  "Other insurance" also means any retention in an insurance policy other than this policy whereby a party other than an insurer is responsible for all or part of any sums payable. "Other insurance" does not include:

(1)  "Scheduled underlying insurance;"

(2)  "The self-insured retention;" or

(3)  Any policy of insurance specifically purchased to be excess of this policy and providing coverage also afforded by this policy.

(Doc. 77-3 at p. 36.) As defined in the XL Policy, "scheduled underlying insurance" means:

(1)  The policy or policies of insurance shown in the Schedule of Underlying Insurance forming a part of this policy [(the "Schedule")]; and

(2)  Any renewal or replacement of any policy identified in Subparagraph (1) above. . . .

(Doc. 77-3 at p. 37.)

62.     The Schedule identifies the 2017 Old Republic Policy and its limits and expressly states: "Defense expenses are in addition to the limits." (Doc. 77-3 at p. 16.)

63.     Under the XL Policy, if the limits for any "scheduled underlying insurance" policy are:

. . . (2) Less than the amount shown in the Schedule of Underlying Insurance, this policy will apply in excess of the amount shown in the

Schedule of Underlying Insurance and any "other insurance" that is applicable and collectible.

(Doc. 77-3 at p. 23, ¶ IV.(G)(2).)

64. The XL Policy provides:

(L) "Maintenance of Underlying Insurance"

During the "policy period" you agree:

(1) To keep "scheduled underlying insurance" in full force and effect.

(2) That the terms, definitions, conditions and exclusions of "scheduled underlying insurance" will not materially change.

(3) That the policy limits for the "scheduled underlying insurance" shall not decrease, except for any reduction or exhaustion of aggregate limits by payment of "loss."

(4) That the coverage of any renewals or replacements of "scheduled underlying insurance" will be no less broad than, and carry limits of insurance equal to or greater than, the policy being renewed or replaced.

If you fail to comply with these requirements, we will be liable only to the same extent that we would have been if you fully complied with these requirements.

(Doc. 77-3 at p. 41).

65.     During the underwriting process for the 2016 and 2017 XL Policies, XL and Giant Eagle's broker shared the understanding that the Old Republic Policies provided for defense costs outside the limits. (Dell Declar. at ¶¶ 3-6; Exs. 2-12 to Appendix.)

66.     On or around March 14, 2016, June Dell, Underwriting Manager for Casualty Excess Liability for XL Specialty Insurance Company received an e-mail from Jeffrey K. Hall, a Senior Vice President at Aon Risk Solutions ("Aon") acting on behalf of Giant Eagle to secure issuance of a umbrella policy starting on April 1, 2016. (Dell Declar. at ¶ 3; Ex. 1 to Appendix.)

67.     On March 21, 2016, Ms. Dell received an e-mail from Mr. Hall that attached the binder of insurance relating to a primary general liability policy that was issued to Giant Eagle by Old Republic Risk Management, Inc. ("Old Republic") for the expiring 2015-2016 policy year (the "2015 Old Republic Binder"), as an exemplar for the primary general liability policy

that was going to be issued by Old Republic for the 2016-2017 policy year. (Dell Declar. at ¶ 3; Ex. 2 to Appendix.)

68.     Among other things, the 2015 Old Republic Binder states that the applicable policy limits were $1,000,000 each occurrence with a products/completed operations aggregate of $3,000,000 and a general aggregate of $15,000,000. (Dell Declar. at ¶ 3; Ex. 2 to Appendix at p. 9.)

69.     Additionally, the 2015 Old Republic Binder states "ALAE is in addition to the Policy Limits. ALAE is retained by the Insured in addition to the Insured's Retention for Loss. The Insured is responsible for all ALAE and all Loss under the Policy." (Dell Declar. at ¶ 3; Ex. 2 to Appendix at p. 9.)

70.     On March 23, 2016, Mr. Hall e-mailed Ms. Dell a copy of Old Republic's proposal to Giant Eagle for the primary general liability policy that would be underlying to XL's umbrella liability policy for the 2016-2017 year (the "2016 Old Republic Proposal"). This proposal stated: "ALAE is in addition to the Policy Limits. ALAE is retained by the Insured in addition to the Insured's Retention for Loss. The Insured is responsible for all ALAE and all Loss under the policy." (Dell Declar. at ¶ 4; Ex. 3 to Appendix at p. 6.)

71.     On March 25, 2016, Ms. Dell e-mailed Mr. Hall XL's proposal for an umbrella liability policy for the 2016-2017 policy year (the "2016 XL Proposal"). The 2016 XL Proposal's "Schedule of Underlying Insurance" identified a general liability policy issued by Old Republic with effective date 4/1/2016 and expiration date 4/1/2017 and confirmed that the Old Republic policy's applicable limits would be $1,000,000 each occurrence, with a products/completed operations aggregate of $3,000,000 and a general aggregate of $15,000,000. The proposal further confirmed that "Defense expenses are in addition to the limits." (Dell Declar. at ¶ 4; Ex. 4. to Appendix at p. 6.)

72.     On March 29, 2016, Mr. Hall accepted XL's proposal on behalf of Giant Eagle, stating: "Per the instructions of the Insured please bind the coverage per your quotation . . . ." (Dell Declar. at ¶ 4; Ex. 5. to Appendix at p. 2.)

73.     On March 30, 2016, Mr. Hall forwarded to XL the binder relating to Old Republic's primary liability policy for the 2016-2017 policy year (the "2016 Old Republic Binder"). The 2016 Old Republic Binder contained the same provision as the 2016 Old Republic Proposal relating to defense costs under the Old Republic Policies, stating: "ALAE is in addition to the Policy Limits. ALAE is retained by the Insured in addition to the Insured's Retention for Loss. The Insured is responsible for all ALAE and all Loss under the policy." (Dell Declar. at ¶ 4; Ex. 6. to Appendix at p. 5.)

74.     On March 31, 2016, Ms. Dell e-mailed Mr. Hall XL's binder for the umbrella policy for the 2016-2017 policy year (the "2016 XL Binder"). The 2016 XL Binder's "Schedule of Underlying Insurance" contained the same information as the 2016 XL Proposal relating to payment of defense costs under the underlying policies, including the statement that "Defense expenses are in addition to the limits" with respect to the underlying Old Republic general liability policy, policy no. MWZY 307316. (Dell Declar. at ¶ 4; Ex. 7 to Appendix at p. 6.)

75.     The 2016 underwriting process culminated in the issuance by XL of Commercial Follow Form and Umbrella Liability Policy No. US00074903LI16A to Giant Eagle for the period April 1, 2016 – April 1, 2017. (Dell Declar. at ¶ 4.)

76.     On February 14, 2017, Mr. Hall e-mailed Ms. Dell to begin the underwriting process for the 2017-2018 policy year. Mr. Hall's email states, among other things, "Afternoon June: Here are the specs and renewal information. Couple of points - nothing 'new,'" which was later followed-up by an email from Mr. Hall dated March 15, 2017. The latter email attached a renewal quote from Old Republic for a primary liability policy for the 4/1/17 - 4/1/18 policy year that Giant Eagle had already instructed Aon to bind (the "2017 Old Republic Proposal"). As with the expiring 2016 Old Republic Policy, the 2017 Old Republic Proposal quote states: "ALAE is in addition to the Policy Limits. ALAE is retained by the Insured in addition to the Insured's Retention for Loss. The Insured is responsible for all ALAE and all Loss under the policy." (Dell Declar. at ¶ 5; Ex. 8 to Appendix at p. 2; Ex. 9 at p. 9.)

77.     Later on March 15, 2017, Mr. Hall sent another e-mail to Ms. Dell attaching Old Republic's binder for its 4/1/17 - 4/1/18 primary policy (the "2017 Old Republic Binder"). The 2017 Old Republic Binder contained the same statement on defense costs as set forth in the 2017 Old Republic Proposal: "ALAE is in addition to the Policy Limits. ALAE is retained by the Insured in addition to the Insured's Retention for Loss. The Insured is responsible for all ALAE and all Loss under the policy." (Dell Declar. at ¶ 6; Ex. 10 to Appendix at p. 6.)

78.     On or around March 16, 2017, Ms. Dell emailed to Mr. Hall XL's proposal for an umbrella liability policy for Giant Eagle for the 4/1/17 - 4/1/18 policy year. The 2017 XL Proposal contained the same terms and conditions as the expiring XL policy, including a statement in the "Schedule of Underlying Insurance" that "Defense expenses are in addition to the limits" with respect to the underlying Old Republic Policy. Shortly thereafter on March 16, 2017, Mr. Hall instructed Ms. Dell to bind the 4/1/17 - 4/1/18 umbrella liability policy pursuant to the terms of the proposal. (Dell Declar. at ¶ 6; Exs. 11-12 to Appendix.)

79.     Per Mr. Hall's instructions, XL's binder for the umbrella liability policy for the 4/1/17 - 4/1/18 policy year (the "2017 XL Binder") was sent later that day. (Dell Declar. at ¶ 6; Ex. 12 to Appendix.)

80.     The 2017 underwriting process culminated in the issuance by XL of Commercial Excess Follow Form and Umbrella Policy No. US00074903LI17A to Giant Eagle for the period April 1, 2017 – April 1, 2018. (Dell Declar. at ¶ 6.)

81.     Giant Eagle's lawsuit seeks declarations of coverage under nine excess policies issued in nine separate policy years. (Doc. 46 at ¶¶ 11-12; 40-41; 53-56; 66.)

82.     In the Opioid Complaints, allegations are made against Giant Eagle as both a "distributor" and as a "dispenser" of opioids. (Giant Eagle's SOF at ¶¶ 24, 29; Doc. 77-6 at ¶ 109; Doc. 77-8 at ¶ 121; Doc. 77-10 at ¶ 105; Doc. 77-11 at ¶ 112.)

83.     Various categories of plaintiffs assert claims against Giant Eagle in the Opioid Complaints. (Doc. 77-6 at ¶¶ 1, 27; Doc. 77-8 at ¶¶ 1, 28; Doc. 77-10 at ¶¶ 1-3, 5-8; Doc. 77-11 at ¶¶ 1-3, 6-8.)

84.     The Opioid Complaints allege various types of wrongdoing in the context of how Giant Eagle operates its business. (Giant Eagle's SOF at ¶¶ 24, 29; Doc. 77-6 at ¶¶ 109, 595-602; Doc. 77-8 at ¶¶ 121, 685-703; Doc. 77-10 at ¶¶ 105, 325-342; Doc. 77-11 at ¶¶ 112, 325-342.)

85.     The Opioid Complaints allege wrongdoing by Giant Eagle spread out over several disparate Giant Eagle locations and operations in multiple states. (Doc. 77-6 at ¶ 103; Doc. 77-8 at ¶ 107; Doc. 77-10 at ¶ 93; Doc. 77-11 at ¶ 100.)

86.     Different types of losses are alleged by the various plaintiffs in the Opioid Complaints. (Doc. 77-6 at ¶¶ 946-49; Doc. 77-8 at ¶¶ 903-06; Doc. 77-10 at ¶¶ 396-408; 446-455; Doc. 77-11 at ¶¶ 396-408; 442-451.)

87.     Coverage under the Old Republic Policies is potentially implicated only where damages are sought "because of 'bodily injury'" caused by an "occurrence," *i.e.*, an "accident." (Doc. 77-4 at pp. 29, 43; Doc. 77-5 at pp. 26, 40.)

88.     As defined in the Old Republic Policies, "bodily injury" means "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (Doc. 77-4 at p. 41; Doc. 77-5 at p. 38.)

89.     The Old Republic Policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 77-4 at p. 43; Doc. 77-5 at p. 40; *see also* Doc. 77-4 at p. 30 and Doc. 77-5 at p. 27 ("This insurance does not apply to . . . 'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured. . . ."))

90.     The allegations in the underlying Opioid Complaints are not based on accidents or fortuitous consequences. (Doc. 77-6 at ¶¶ 3, 9, 14, 21, 548, 827-28; Doc. 77-8 at ¶¶ 3, 9, 14, 22, 566, 781-82; Doc. 77-10 at ¶¶ 324-25, 335, 343-45; 457-58; Doc. 77-11 at ¶¶ 324-25, 335, 343-45, 453-54.)

91.     On August 19, 2019, the plaintiffs in the County Complaints dismissed the following causes of actions from their respective actions: (1) Negligence (Seventh Claim for Relief); (2) Common Law Fraud (Eight Claim for Relief); (3) Injury Through Criminal Acts (Ninth Claim for Relief); and (4) Unjust Enrichment (Tenth Claim for Relief). (Ex. 18 to Appendix.)

92.     The Opioid Complaints include allegations that "[f]or over a decade, as the Marketing Defendants increased the demand for opioids, all the Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold." (Doc. 77-6 at ¶ 481; Doc. 77-8 at ¶ 494; *see also* Doc. 77-10 at ¶¶ 13, 325; Doc. 77-11 at ¶¶ 13, 325.)

93.     The Opioid Complaints center on, "(a) a marketing scheme involving the false and deceptive marketing of prescription opioids, which was designed to dramatically increase the demand for and sale of opioids and opioid prescriptions; and (b) a supply chain scheme, pursuant to which the various entities in the supply chain failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified, thereby contributing to the oversupply of such drugs and fueling an illegal secondary market." (Doc. 77-6 at ¶ 9; Doc. 77-8 at ¶ 9; Doc. 77-10 at ¶¶ 13-14; Doc. 77-11 at ¶¶ 13-14; *see also* Doc. 77-6 at ¶¶ 510-18, 520-536, 807-813; Doc. 77-8 at ¶¶ 526-535, 536-553, 761-67; Doc. 77-10 at ¶¶ 409-412; Doc. 77-11 at ¶¶ 409-412.)

94.     The Opioid Complaints further allege that "[p]ublic statements by the Defendants and their associates created the false and misleading impression to regulators, prescribers, and the public that the Defendants rigorously carried out their legal duties, including their duty to report suspicious orders and exercise due diligence to prevent diversion of these dangerous drugs, and further created the false impression that these Defendants also worked voluntarily to prevent diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact." (Doc. 77-6 at ¶ 582; Doc. 77-8 at ¶ 607; Doc. 77-10 at ¶¶ 302, 394-95; Doc. 77-11 at ¶¶ 302, 394-95.)

95.     The Opioid Complaints allege that "[a]s a direct and foreseeable result of Defendants' conduct, cities and counties across the nation . . . are now swept up in what the CDC has called a 'public health epidemic . . . .'" (Doc. 77-6 at ¶ 17; Doc. 77-8 at ¶ 18; Doc. 77-10 at ¶ 10; Doc. 77-11 at ¶ 10.)

96.     The Opioid Complaints allege that "[t]he distribution and diversion of opioids into Ohio and into Cuyahoga County . . . created a foreseeable opioid crisis . . ." (Doc. 77-6 at ¶ 31; *see also* Doc. 77-8 at ¶ 36; Doc. 77-10 at ¶¶  318–320; Doc. 77-11 at ¶¶ 318-320.)

97.     The Opioid Complaints allege that "[b]y flooding Ohio with more opioids than could be used for legitimate medical purposes and by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses, Defendants breached that duty and both created and failed to prevent a foreseeable risk of harm." (Doc. 77-6 at ¶ 486; Doc. 77-8 at ¶ 502; Doc. 77-10 at ¶¶ 323-24; Doc. 77-11 at ¶¶ 323-24.)

98.     The Opioid Complaints allege that "Defendants know, and have known, that their intentional, unreasonable, and unlawful conduct will cause, and has caused, opioids to be used and possessed illegally and that their conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Plaintiff and Plaintiff's communities." (Doc. 77-7 at ¶ 124; Doc. 77-9 at ¶ 110; Doc. 77-10 at ¶¶ 319-324; Doc. 77-11 at ¶¶ 319-324.)

99.     The County Complaints expressly state that "Plaintiff does not seek damages for death, physical injury to person, [or] emotional distress." (Doc. 77-7 at  ¶ 159; Doc. 77-9 at  ¶ 144.)

100.    The County Complaints allege: "From 2000 to 2012, the State [Ohio] experienced a more that [sic] 366% increase in drug overdose deaths, a startling statistic driven largely by overdoses from prescription drugs." (Doc. 77-6 at ¶ 671; Doc. 77-8 at ¶ 718.)

101.    The County Complaints allege: "In Ohio, the number of infants born with NAS increased six-fold in from 2004 to 2011." (Doc. 77-6 at ¶ 689; Doc 77-8 at ¶ 742.)

102.    The County Complaints allege: "Since the push to expand prescription opioid use began in the late 1990s, the death toll has steadily climbed, with no sign of slowing. The number of opioid overdoses in the United States rose from 8,000 in 1999 to over 20,000 in 2009, and over 33,000 in 2015." (Doc. 77-6 at ¶ 4; Doc. 77-8 at ¶ 4.)

103.    The County Complaints allege: "From 1999 through 2016, overdoses killed more than 350,000 Americans" (Doc. 77-6 at ¶ 5; *see also* Doc. 77-8 at ¶ 5.)

104.    The County Complaints allege: "As a result, in part, of the proliferation of opioid pharmaceuticals between the late 1990s and 2015, the life expectancy for Americans decreased for the first time in recorded history." (Doc. 77-6 at ¶ 7; Doc. 77-8 at ¶ 7.)

105.    The NAS Complaints allege: "The incidence of NAS in the United States grew five-fold between 2000 and 2012. Specifically, cases of NAS increased nationally from a rate of 1.2 per 1000 hospital births per year in 2000 to 5.8 per 1000, with a total of 21,732 infants diagnosed by 2012." (Doc. 77-10 at ¶ 117; Doc. 77-11 at ¶ 117.)

106.    One NAS Complaint defines the Putative Class as "Legal Guardians of United States residents born after March 16, 2000, who were medically diagnosed with opioid-related "Neonatal Abstinence Syndrome" ("NAS") at or near birth and whose mother received a prescription for opioids or opiates prior to the birth and those opioids or opiates were manufactured, distributed, or filled by a Defendant or Purdue entity." (Doc. 77-10 at ¶ 8)

107.    The NAS Complaints allege: "[B]eginning in the mid-1990s, the Manufacturer, Distributor, and Pharmacy Defendants acted in concert to create two new markets for prescription opiates which had not otherwise existed: (i) *an incredibly high-volume primary market* in which prescriptions of opioids for widespread and chronic pain were written for Americans, including women of child-bearing age and (ii) *a secondary market* into which those opioids were easily diverted from the flooded primary market." (Doc. 77-10 at ¶ 13; Doc. 77-11 at ¶ 13.)

108.    One NAS Complaint alleges: "From 2006 to 2018, there were approximately 17,373 hospital discharges of infants suffering from NAS of Ohio residents in Ohio hospitals." (Doc. 77-11 at ¶ 4.)

109.    One NAS Complaint defines the Putative Class as "Legal Guardians of Ohio residents born after May 9, 2000, who were medically diagnosed with opioid-related "Neonatal Abstinence Syndrome" ("NAS") at or near birth and whose birth mother received a prescription for opioids or opiates prior to the birth and those opioids or opiates were manufactured, distributed, or filled by a Defendant, a Purdue entity, or Insys. (Doc. 77-11 at ¶ 8.)

January 10, 2020                    /s/ Bruce W. McCullough
                                    Bruce W. McCullough (admitted *pro hac vice*)
                                    BODELL BOVE, LLC
                                    1225 N. King Street
                                    Suite 1000
                                    Wilmington, DE 19801
                                    (302) 655-6749
                                    bmccullough@bodellbove.com

                                    Louis A. Bove (Bar ID PA 53071)
                                    Ronald (Rex) F. Brien, Jr. (Bar ID Pa 40884)
                                    BODELL BOVE, LLC

1845 Walnut Street
Suite 1100
Philadelphia, PA 19103
(215) 864-6602
(215) 864-6609
lbove@bodellbove.com
rbrien@bodellbove.com

Michael M. Marick (admitted *pro hac vice*)
Karen M. Dixon (admitted *pro hac vice*)
W. Joel Vander Vliet (admitted *pro hac vice*)
SKARZYNSKI MARICK & BLACK LLP
353 N. Clark Street, Suite 3650
Chicago, IL 60654
(312) 946-4200
mmarick@skayzynski.com
kdixon@skarzynski.com
wvandervliet@skarzynski.com

*Attorneys for Defendant and Third-Party Plaintiff
American Guarantee and Liability Insurance
Company*

and

/s/ Matthew A. Meyers
Robert E. Dapper Jr. (Pa. ID 46378)
Matthew A. Meyers (Pa. ID 202838)
BURNS WHITE
Burns White Center
48 26th Street
Pittsburgh, PA 15222
Telephone: 412-995-3250
Facsimile: 412-995-3300
redapper@burnswhite.com
mameyers@burnswhite.com

John Grossbart (*pro hac vice*)
Keith Moskowitz (*pro hac vice*)
DENTONS US LLP
233 S. Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934
john.grossbart@dentons.com

keith.moskowitz@dentons.com

Samantha Wenger (*pro hac vice*)
DENTONS US LLP
4520 Main Street
Suite 1100
Kansas City, MO 64111-7700
Telephone: (816) 460-2400
Facsimile: (816) 531-7545
Samantha.wenger@dentons.com

Roy Xiao (*pro hac vice*)
DENTONS US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Facsimile: (404) 527-4198
Roy.xiao@dentons.com

*Attorneys for Defendant and Third-Party Plaintiff*
*XL Specialty Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that on 10th day of January 2020, a copy of the foregoing **AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY AND XL SPECIALTY INSURANCE COMPANY'S JOINT RESPONSE TO GIANT EAGLE'S STATEMENT OF MATERIAL FACTS AND SUPPLEMENTAL CONCISE STATEMENT OF MATERIAL FACTS, AND AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY AND XL SPECIALTY INSURANCE COMPANY'S CONCISE STATEMENT OF ADDITIONAL MATERIAL FACTS** was filed electronically via the ECF filing system and served upon counsel for all parties via the same.

/s/ Matthew A. Meyers
Matthew A. Meyers